920 P.2d 334

The BEST PLACE, INC., a Hawai'i
corporation, Plaintiff–Appel-
lant/Cross–Appellee,

v.

PENN AMERICA INSURANCE COMPA-
NY, a foreign corporation, Defendant–
Appellee/Cross–Appellant,

and

John Does 1 through 10; Doe Partner-
ship, Corporation and/or Other En-
tities 1 through 20, Defendants.

No. 16065.

Supreme Court of Hawai'i.

June 5, 1996.

As Amended June 21, 1996.

**122**

Michael R. Goodheart of Goodheart and Tady, on the briefs, Woodland Hills, CA, for plaintiff-appellant/cross-appellee.

Chuck T. Narikiyo, Chad P. Love and Myles T. Yamamoto of Love & Yamamoto, on the briefs, Honolulu, for defendant-appellant/cross-appellant.

Before MOON, C.J., LEVINSON, NAKAYAMA and RAMIL, JJ., and BURNS, Intermediate Court of Appeals Chief Judge, in place of KLEIN, J., Recused.

NAKAYAMA, Justice.

This appeal and cross-appeal arise from a complaint filed by the plaintiff-appellant/cross-appellee The Best Place, Inc. (Best Place) against its insurer, the defendant-appellee/cross-appellant Penn America Insurance Company (Penn). The complaint alleged the following two counts: (1) breach of contract; and (2) tortious breach of the implied covenant of good faith and fair dealing (the tort of bad faith). Prior to trial, both parties filed various motions *in limine*. Arguing that Hawai'i does not recognize the tort of bad faith in the insurance context, Penn moved to exclude all evidence, testimony, argument, or comment on the issue of tortious bad faith and/or punitive damages. Penn also moved to exclude, *inter alia*, evidence of a settlement offer. Best Place moved: (1) to exclude certain evidence based on (a) waiver, (b) estoppel, and (c) Hawai'i Rules of Evidence (HRE) 403; and (2) for default and sanctions against Penn.

The circuit court granted Penn's motion to exclude all evidence dealing with the tort of bad faith, as well as Penn's motions to exclude evidence of the settlement offer. The circuit court also granted Best Place's two pretrial motions. Best Place, with leave of court, filed an interlocutory appeal pursuant to Hawai'i Revised Statutes (HRS) § 641–1(b) (1993),[1] and Penn filed a cross-appeal.

The primary issue in this appeal is whether Hawai'i recognizes the tort of bad faith refusal to pay a valid claim submitted by an insured under a policy of insurance. For the

---

1. In granting Best Place's motion for interlocutory appeal, the circuit court also allowed Best Place to appeal from a pretrial ruling allowing Penn to call five trial witnesses.

reasons set forth below, we vacate the circuit court order granting Penn's motion *in limine* regarding tortious bad faith and hold that Hawai'i recognizes the tort of bad faith in the first-party insurance context.

## I. BACKGROUND

In 1986–87, Best Place operated a bar/nightclub in Waikīkī. Best Place insured the nightclub against fire under a policy issued in 1987 by Penn. Approximately four months after Penn issued the policy to Best Place, a fire broke out and destroyed the nightclub. Police and fire officials concluded that arson was the cause of the fire.

An investigation by Penn into the nightclub's finances revealed that the nightclub lost money each and every month it was in operation. Furthermore, Penn discovered that, although many of the nightclub's bills were unpaid, the manager and majority stockholder of the nightclub, Sara Hernandez, paid the fire insurance premium with a cashier's check three days prior to the fire.

After the fire, Best Place demanded payment on the insurance policy from Penn. However, because the circumstances surrounding the fire were suspect, Penn insisted that Hernandez submit to an examination under oath. In addition, Penn required that Best Place submit a complete "Proof of Loss" form as mandated under the policy, and requested other documents relevant to Penn's evaluation of the claim. Hernandez failed to submit to an examination under oath and did not turn over the requested documents. Consequently, Penn refused to act on Best Place's demand for payment on the fire insurance policy.

Best Place thereafter retained an attorney. On February 3, 1988, February 19, 1988, and March 23, 1988, the attorney sent letters to Penn's attorney seeking to ascertain the basis of Penn's prior requests, as well as an explanation for non-payment of Best Place's claim. No further communication transpired between the parties, and, on June 20, 1988, Best Place filed a complaint against Penn alleging: (1) breach of contract; and (2) tortious breach of the implied covenant of good faith and fair dealing. Prior to trial, both parties filed a number of motions *in limine*. Following the circuit court's ruling on these motions, Best Place took an interlocutory appeal pursuant to HRS § 641–1(b). Penn filed a cross-appeal challenging the circuit court's evidentiary rulings.[2]

## II. STANDARD OF REVIEW

The primary issue on appeal, *i.e.,* whether Hawai'i recognizes the tort of bad faith, is a question of law. Questions of law are reviewable *de novo* under the right/wrong standard of review. *State v. Baranco,* 77 Hawai'i 351, 355, 884 P.2d 729, 733 (1994). The other issues on appeal will be discussed in their respective sections.

## III. DISCUSSION

### A. Implied Covenant of Good Faith and Fair Dealing

Historically, the duty of good faith and fair dealing was implied in contracts with conditions of satisfaction, *e.g.,* a contract for the painting of a portrait or for the supply of materials.[3] However, every contract contains an implied covenant of good faith and

2. In its answering brief, Penn questioned "whether this court has jurisdiction over [Best Place's] appeal." Following the circuit court's order on the motions in limine, and prior to the filing of Best Place's notice of appeal, Penn filed two motions for reconsideration on two of the circuit court's interlocutory orders that were collateral to Best Place's issues on appeal. The circuit court denied Penn's motions for reconsideration subsequent to the filing of Best Place's notice of appeal. Penn contends that, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 4(a)(4), "[t]he tolling effect of the two motions for reconsideration casts doubt over the timeliness of [Best Place's] appeal." Essentially,

Penn contends that Best Place's "notice of appeal was premature and void." We disagree. Because Penn moved for reconsideration solely of the rulings from which it is appealing, the motions for reconsideration had no tolling effect on the orders from which Best Place is appealing. Best Place, therefore, was not required to re-file its notice of appeal subsequent to the circuit court's denial of the motions for reconsideration. Accordingly, we have jurisdiction in this case.

3. *See* W. Shernoff, S. Gage & H. Levine, *Insurance Bad Faith Litigation,* § 1.07[1] (1994).

fair dealing that neither party will do anything that will deprive the other of the benefits of the agreement. *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal.2d 654, 328 P.2d 198, 200 (1958); *Wagenseller v. Scottsdale Memorial Hospital*, 147 Ariz. 370, 383, 710 P.2d 1025, 1038 (1985); *Kerrigan v. City of Boston*, 361 Mass. 24, 278 N.E.2d 387, 393 (1972). *But see English v. Fischer*, 660 S.W.2d 521, 522 (Tex.1983) (concluding that there is no covenant of good faith and fair dealing implied in every contract).

In the insurance context, courts first recognized the duty of good faith and fair dealing where the issue was whether a liability insurer wrongfully refused to settle a third-party claim.[4] The early case of *Brassil v. Maryland Casualty Co.*, 210 N.Y. 235, 104 N.E. 622 (1914), recognized the principle that the obligation of good faith and fair dealing underlies all written agreements and that a breach of this obligation is a breach of *contract.* In *Brassil,* the New York Court of Appeals stated:

> [T]here is a contractual obligation of universal force which underlies all written agreements. It is the obligation of good faith in carrying out what is written....
>
> [The insured's] rights ... go deeper than the mere surface of the contract written for him [or her] by the [insurer]. Its stipulations imposed obligations based upon those principles of fair dealing which enter into every contract.

*Brassil,* 104 N.E. at 624. The court then held that the insurer breached its contractual obligation of good faith when it unreasonably failed to settle a third-party settlement offer. *Id.*

In *Hilker v. Western Automobile Ins. Co.*, 204 Wis. 1, 231 N.W. 257, 259–60 (1930), *aff'd on reh'g*, 204 Wis. 1, 235 N.W. 413 (1931), the Supreme Court of Wisconsin, citing *Brassil, supra,* set forth the following rationale for imposing liability upon an insurer who refused to settle a third-party claim within policy limits:

> In view of the fact that these contracts of insurance are prepared by the company and not prescribed by law, the tendency of the decisions has been to extend, rather than to circumscribe, the field of liability on the part of the company and to hold that the rights of the insured 'go deeper than the mere surface of the contract written for him by the defendant. Its stipulations imposed obligations based upon those principles of fair dealing which enter into every contract.' *Brassil,* 104 N.E. at 624, L.R.A. 1915A, 629, 632. The covenant of good faith and fair dealing, of course, is not limited to insurance contracts.

The cornerstone of the decisions in *Brassil* and *Hilker* is that, in every contract, there is an implied covenant of good faith and fair dealing.

■ The obligation to deal in good faith is now a well-established principle of contract law. Restatement (Second) Contracts § 205 (1979) provides that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." In *Hawai'i Leasing v. Klein*, 5 Haw.App. 450, 456, 698 P.2d 309, 313 (1985), the Intermediate Court of Appeals (ICA) explicitly recognized that parties to a contract have a duty of good faith and fair dealing in performing contractual obligations.[5] We also note that the parties to all commercial con-

---

4. A "third-party claim" is one where the insurer contracts to defend the insured against claims made by third parties against the insured and to pay any resulting liability, up to the specified dollar limit. In contrast, a "first-party claim" refers to an insurance agreement where the insurer agrees to pay claims submitted to it by the insured for losses suffered by the insured.

5. One exception to this well established principle of contract law is the at-will employment doctrine. In *Parnar v. Americana Hotels*, 65 Haw. 370, 652 P.2d 625 (1982), we noted that an at-will employment contract, by definition, is ter-

minable at the will of either party, for any reason or no reason at all. As such, parties to an at-will employment contract enter into the contract with full knowledge that the employment is for an indefinite duration and can terminate at the will of either party. Given the unique nature of the at-will employment relationship, this court refused to imply a duty to terminate in good faith. Our holding in *Parnar*, however, is limited to the at-will employment context, and Hawai'i continues to adhere to the general principle that, in every contract, the law imposes on the parties a duty of good faith and fair dealing.

tracts in this jurisdiction are subject to a statutory duty to perform in good faith. *See* HRS § 490:1–203 (1993) (providing that "[e]very contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement.").

We now address the question of whether a breach of this duty in the insurance context gives rise to a bad faith cause of action.

### B. *Bad Faith Cause of Action for Insurer Misconduct*

This court has never explicitly recognized a bad faith cause of action for insurer bad faith. Its recognition, however, is wholly consistent with the case law in this jurisdiction, as well as the statutory provisions dealing with insurer misconduct.

### 1. *Case Law Dealing with Insurer Bad Faith*

In *Gossinger v. Association of Apartment Owners,* 73 Haw. 412, 835 P.2d 627 (1992), in which we held that a mistake as to the nature and extent of an insured's injury was not a proper basis for the insured to rescind a release agreement, we quoted with approval the following language from Justice Spear's dissent in *Williams v. Glash,* 789 S.W.2d 261 (Tex.1990): "Insurers are now faced with a Hobson's choice. If they settle claims promptly, they are not protected from the later assertion of unknown claims. If they refuse to settle until all injuries are known, then they face potential liability under a *bad faith claim.*" *Gossinger,* 73 Haw. at 424–25 n. 5, 835 P.2d at 634 n. 5 (emphasis added and citation omitted).

In *Stratis v. Pacific Ins. Co., Ltd.,* 7 Haw. App. 1, 739 P.2d 251 (1987), an insured brought an action against its insurer alleging breach of contract and bad faith settlement of the insurance claim. The jury found in favor of the defendant insurance company and the plaintiff appealed, challenging, *inter alia,* the trial court's refusal of plaintiff's proffered jury instructions. Among the instructions refused by the trial court was the following: "An insurer may breach the covenant of good faith and fair dealing in an insurance contract when it fails to properly investigate [the] insured's claim." *Id.* at 10, 739 P.2d at 257.

On appeal, the ICA held that the trial court properly refused the instruction because it was not obligated to accept an instruction that did not state the law with substantial correctness. *Id.* The ICA reasoned, however, that the jury instruction was incorrect because it failed to contain a qualifying clause,[6] not because it stated a cause of action that this jurisdiction would not recognize.

In *Colonial Penn Ins. Co. v. First Ins. Co. of Hawai'i,* 71 Haw. 42, 780 P.2d 1112 (1989), an injured claimant sued a third-party tortfeasor's insurer for bad faith denial of no-fault benefits. This court affirmed the trial court's order granting the insurer's motion for summary judgment on grounds that the actions of the insurer did not constitute bad faith in its denial of no-fault benefits. We held that the trial court was correct because the insurer denied payment of benefits based on an unsettled question of law. In so holding, we implicitly recognized that an insurer may be liable for bad faith under the appropriate circumstances.[7]

### 2. *Statutory Provisions*

There is an abundance of statutory law regulating the insurance industry in Hawai'i. The Hawai'i Legislature has recognized that

---

**6.** The ICA required the jury instruction to include the following qualifying clause: "... if committed without just cause and performed with such frequency as to indicate a general business practice[.]" *Stratis,* 7 Haw.App. at 10, 739 P.2d at 257 (quoting HRS § 431–647(a) (1976)).

**7.** Also implicit in our decision in *Colonial Penn,* then, is that Hawai'i might recognize a bad faith cause of action brought by an injured claimant even absent a contractual relationship between the injured claimant and the third-party tortfeasor's insurance company. However, we expressly decline to rule on the viability of that particular cause of action in this jurisdiction at this time. We cite our decision in *Colonial Penn* simply as an indication of our willingness to support a cause of action based on insurer bad faith and not for the proposition that Hawai'i would recognize a bad faith cause of action brought by an injured claimant against a third-party tortfeasors' insurance company.

the insurance industry affects the public interest, and, therefore, insurers are obligated to act in good faith. Under HRS § 431:1–102 (1993),

> [t]he business of insurance is one affected by the public interest, requiring that *all persons be actuated by good faith, abstain from deception and practice honesty and equity in all insurance matters.* Upon the insurer, the insured and their representatives rests the duty of preserving inviolate the integrity of insurance.

(Emphasis added.) This obligation of good faith is consistent with other provisions that contemplate a cause of action for insurer bad faith. For example, in the no-fault (automobile) insurance context, HRS § 431:10C–315 (1993) sets forth the applicable statute of limitations for a bad faith cause of action against an insurer as follows:

> **Statute of limitations.** (a) No suit shall be brought on any contract providing no-fault benefits or any contract providing optional additional coverage more than, the later of: ....
>
> (4) Two years after the entry of a final judgment in, or dismissal with prejudice of, a tort action arising out of a motor vehicle accident, *where a cause of action for insurer bad faith arises out of the tort action.*

(Emphasis added.)

In addition, HRS § 624–25.5(b) (1993), which relates to medical and peer review proceedings, provides in relevant part:

> **Proceedings and records of medical, dental and optometric peer review committees and hospitals.**
>
> ....
>
> (b) Neither the proceedings nor the records of peer review committees, or hospital or clinic quality assurance committees shall be subject to discovery.... The prohibition relating to discovery or testimony

shall not apply to the statements made by any person in attendance at the meeting who is a party to an action or proceeding the subject matter of which was reviewed at the meeting, or to any person requesting hospital staff privileges, *or in any action against an insurance carrier alleging bad faith by the carrier in refusing to accept a settlement offer within the policy limits.*

(Emphasis added.)

A strong argument against the adoption of a bad faith cause of action is that the statutory remedies provided by the legislature are adequate, and additional remedies are unnecessary. *See Spencer v. Aetna Life & Cas. Ins. Co.,* 227 Kan. 914, 611 P.2d 149, 153 (1980) and the cases cited therein. The premise behind this argument is that the statutory scheme regulating the insurance industry provides sufficient incentive to insurers to perform their obligations in good faith. However, the viability of this contention necessarily depends on the applicable state statutory scheme. We therefore turn to the relevant provisions of the Hawai'i Revised Statutes.

Article 13 of the Hawai'i Insurance Code addresses the subject of "unfair methods of competition and unfair and deceptive acts and practices in the business of insurance."[8] In order to deter insurer misconduct, cease and desist orders pursuant to HRS §§ 431:13–201 and –202 provide administrative penalties for unfair claims practices. However, HRS § 431:13–107 delegates all enforcement authority exclusively to the insurance commissioner.[9] Therefore, Article 13 of the Hawai'i Insurance Code does not authorize a private cause of action pursuant to its administrative remedies. *See Genovia v. Jackson National Life Ins. Co.,* 795 F.Supp. 1036, 1044 (D.Haw.1992).

---

**8.** HRS § 431:13–101 (1993) provides:
**Purpose.** The purpose of this article is to regulate trade practice in the business of insurance in accordance with the intent of the Congress of the United States as expressed in the act of Congress of March 9, 1945 (Public Law 15, 79th Congress), by defining, or providing for the determination of, all acts, methods, and practices which constitute unfair methods of competition or unfair or deceptive acts or practices in this State, and by prohibiting the trade practices so defined or determined.

**9.** HRS § 431:13–107 (1993) provides that "[a]ll remedies, penalties and proceedings set forth in this article are to be invoked solely and exclusively by the commissioner."

The existing administrative remedies, however, are not exclusive. Indeed, HRS § 431:13–202(b) (1993) provides that "[n]o order of the Commissioner pursuant to this section or order of court to enforce it shall in any way relieve or absolve any person affected by the order from any other liability, penalty, or forfeiture required by law." This provision clarifies any question as to Article 13's preemptive effect. In addition, we glean from the legislative history of HRS § 431:13–202(b) that the legislature deemed the existing administrative remedies inadequate. A relevant Senate Committee report provides as follows:

> Your committee finds that this bill would prevent an insurance carrier, engaged in unfair claim settlement practices, from claiming that the cease and desist provision is an exclusive remedy.
>
> Furthermore, the current cease and desist remedy is inadequate because the administrative procedure could be lengthy thereby allowing an insurance carrier to continue to engage in unfair and deceptive practices during the pendency of the administrative hearing; the revocation of an insurance carrier's license by the commissioner is not likely to occur since this would have a detrimental effect on innocent policy holders; and the administrative procedures do not afford compensation to the individual damaged by the insurance carrier.

Sen.Stand.Comm.Rep. No. 607, in 1987 Sen. Journal, at 1146. The relevant House Committee Report states:

> Your Committee finds that the current administrative procedure for cease and desist orders by the Insurance Commissioner are inadequate and do not afford compensation to the individual damaged by the carrier's unfair claim settlement practices. Therefore, your Committee emphasizes its accord with the provisions of this bill clarifying that the cease and desist order is not the exclusive remedy.

Hse.Stand.Comm.Rep. No. 1518, in 1987 House Journal, at 1802. With respect to subsequent legislation intended to clarify any lingering ambiguities, a Senate Committee stated:

> This bill and Act 97, Session Laws of Hawai'i 1987, are not intended to indicate legislative support or objection to the recognition of a statutory private cause of action with respect to violations of Article 13 of the Insurance Code. This bill and Act 97 are also not intended to impair the court's ability to recognize or decline to recognize such a right.

Sen.Stand.Comm.Rep. 1715, in 1989 Sen. Journal, at 1423.

Based on the foregoing, we reject the contention that the statutory scheme regulating the insurance industry in Hawai'i furnishes insureds with an adequate remedy and provides sufficient incentive to insurers to perform their obligations in good faith.

■ Because: (1) there is case law in this jurisdiction, as well as various statutory provisions contemplating a cause of action for insurer bad faith; and (2) recognizing a bad faith cause of action would not contravene the legislative intent with respect to the remedies for insurer misconduct, we hold that Hawai'i now recognizes a bad faith cause of action in the first-party insurance context.

We now address the appropriate theories under which an insured may bring a bad faith cause of action.

### C. Tort or Contract Recovery

#### 1. Background

California has led the way in the modern development of the bad faith cause of action for insurer misconduct. In *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal.2d 654, 328 P.2d 198 (1958), and *Crisci v. Security Ins. Co*, 66 Cal.2d 425, 58 Cal.Rptr. 13, 426 P.2d 173 (1967), both third-party cases, the California Supreme Court held that an insurer's breach of the implied covenant of good faith and fair dealing gives rise to a cause of action in tort, as well as contract.

By characterizing the insured's cause of action as sounding in tort, the courts adopting this reasoning made available to the insured a broader range of compensatory damages and certain additional items of recovery, such as damages for emotional stress and punitive damages, which are

generally not available in actions founded solely on breach of contract.

W. Shernoff, S. Gage & H. Levine, *Insurance Bad Faith Litigation,* § 1.07[2] (1994).

The theoretical underpinnings of *Comunale* and *Crisci* were instrumental in the landmark case of *Gruenberg v. Aetna Ins. Co.,* 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973). In *Gruenberg,* the California Supreme Court extended the tort of bad faith in the third-party context to the first-party situation. The insured in *Gruenberg* alleged bad faith and outrageous conduct on the part of his insurance companies for denying payment of three fire insurance policies. The court in *Gruenberg,* relying on its earlier reasoning in *Comunale* and *Crisci,* explained that, in third-party cases:

> we considered the duty of the insurer to act in good faith and fairly in handling the claims of third persons against the insured, described as a 'duty to accept reasonable settlements;' in the case before us we consider the duty of an insurer to act in good faith and fairly in handling the claim of an insured, namely a duty not to withhold unreasonably payments due under a policy. These are merely two different aspects of the same duty. That responsibility is not the requirement mandated by the terms of the policy itself—to defend, settle, or pay. It is the obligation, deemed to be imposed by law, under which the insurer must act fairly and in good faith in discharging its contractual responsibilities. Where in doing so, it fails to deal *fairly and in good faith* with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of the implied covenant of good faith and fair dealing.

*Gruenberg,* 108 Cal.Rptr. at 485, 510 P.2d at 1037 (emphasis added).[10]

The decision in *Gruenberg* established that the defendant's duty of good faith and fair dealing, implied by law, is unconditional and independent of the performance of plaintiff's contractual obligations. The *Gruenberg* court explained that, because an insurer's duty is independent of the contract, an insured's non-performance of its contractual duties cannot excuse a breach of the duty of good faith and fair dealing. *Id.* 108 Cal.Rptr. at 488, 510 P.2d at 1040. Therefore, the court concluded that insurance companies owe an *absolute* duty of good faith and fair dealing to their insureds. *Id.*

In allowing a tort recovery for breach of the covenant of good faith and fair dealing in an insurance contract, some courts have emphasized "the 'special relationship' between insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility." *Seaman's Direct Buying Service Inc. v. Standard Oil Company of California,* 36 Cal.3d 752, 206 Cal.Rptr. 354, 362, 686 P.2d 1158, 1166 (1984). In adopting the tort of bad faith in the first-party context, the Arizona Supreme Court observed that:

> The special nature of an insurance contract has been recognized by courts and legislatures for many years. A whole body of case and statutory law has been developed to regulate the relationship between insurer and insured. An insurance policy is not obtained for commercial advantage; it is obtained as protection against calamity. In securing the reasonable expectations of the insured under the insurance policy there is usually an unequal bargaining position between the insured and the insurance company.... Often the insured is in an especially vulnerable economic position when such a casualty loss occurs. The whole purpose of insurance is defeated if an insurance company can refuse or fail,

---

10. Since the *Gruenberg* decision, numerous other jurisdictions have adopted a "bad faith" tort cause of action in the first-party context. *See Spencer v. Aetna Life and Cas. Ins. Co.,* 227 Kan. 914, 611 P.2d 149, 151–52 (1980) (listing those jurisdictions that have expressly adopted *Gruenberg* or a position similar to it). Today, a majority of jurisdictions now recognize some form of common law bad faith in the first-party context. *See* N. Goldberg, T. Segalla, R. Cohen, *Can the*

*Puzzle Be Solved: Are Punitive Damages Awardable In New York For First–Party Bad Faith,* 44 Syracuse L.Rev. 723, 729 (1993) (citing as examples Alabama, Alaska, Arizona, Colorado, Connecticut, Delaware, Idaho, Iowa, Kentucky, Nebraska, Nevada, North Carolina, North Dakota, Ohio, Oklahoma, New Mexico, Rhode Island, South Carolina, South Dakota, Texas, and Wyoming).

without justification, to pay a valid claim. We have determined that it is reasonable to conclude that there is a legal duty implied in an insurance contract that the insurance company must act in good faith in dealing with its insured on a claim, and a violation of that duty of good faith is a tort.

*Noble v. National American Life Ins. Co.,* 128 Ariz. 188, 189–90, 624 P.2d 866, 867–68 (1981) (citations omitted). Other jurisdictions have used similar reasoning in recognizing a common-law cause of action in tort for breach of the duty of good faith and fair dealing. *See, e.g., Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987); *State Farm Fire & Cas. Co. v. Nicholson,* 777 P.2d 1152, 1157 (Alaska 1989); *White v. Unigard,* 112 Idaho 94, 730 P.2d 1014 (1986).

Notwithstanding the various characteristics unique to a contract for insurance that justify a first-party bad faith cause of action in tort, there is a minority of jurisdictions that have rejected a common-law cause of action for insurer bad faith in first-party cases. A common argument used by courts that do not recognize first-party bad faith is the absence of a fiduciary relationship between the insurer and insured in a first-party situation.

The first-party relationship is distinguishable from the third party situation. In third party claims, the absolute control of trial and settlement is in the hands of the insurer. That control gives rise to a fiduciary relationship between the insurer and the insured. In first party claims the insurer is not in a position to expose the insured to a judgment in excess of policy limits through its unreasonable refusal to settle a case nor is the insurer in exclusive control of the defense. Although an insurer must make a good faith attempt to settle claims [K.S.A. 40–240(9)(f) ], the insurer and insured in a first party relationship have an adversarial relationship, rather than a fiduciary relationship.

*Spencer v. Aetna Life & Cas. Ins. Co.,* 227 Kan. 914, 611 P.2d 149, 155 (1980) (brackets in original); *see also Farris v. United States Fid. & Guar. Co.,* 284 Or. 453, 587 P.2d 1015 (1978) (concluding that the fiduciary position of the insurer in representing the insured in litigation gives rise to cause of action in tort); *Lawton v. Great Southwest Fire Ins. Co.,* 118 N.H. 607, 392 A.2d 576 (1978) (absent a fiduciary relationship, insured can only bring a bad faith cause of action in contract); *Beck v. Farmers Ins. Exchange,* 701 P.2d 795, 800 (Utah 1985) ("In the first-party situation ... the reasons for finding a fiduciary relationship and imposing a corresponding duty are absent. No relationship of trust and reliance is created by the contract[.]") (citing *Santilli v. State Farm Life Ins. Co.,* 278 Or. 53, 562 P.2d 965, 969 (1977)).

We regard this rationale as unpersuasive because it is premised on the assumption that tort liability in the third-party context is based solely on an agency theory and the resulting fiduciary obligations. The agency relationship, however, is not a condition precedent for imposing tort liability on insurers who fail to perform their obligations in good faith. Hawai'i law imposes a duty of good faith and fair dealing in *all* contracts, not only those in which there is an agency relationship. Whether a breach of this duty will give rise to a cause of action in tort, then, depends upon the duty or duties inherent in a particular type of contract. In the insurance context, we believe that the fiduciary duty on the part of the insurer in the third-party context, albeit significant, is but one component of a broader duty to act in good faith and deal fairly with its insureds so as not to deprive the insured of the very benefits for which he or she has contracted.

What are the benefits which flow from the insurance contract and the relationship it creates? Obviously, the insured buys the company's express agreement to pay certain types of claims. But the implied covenant of good faith is an implied covenant. *Wagenseller [v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 710 P.2d 1025 (1985) ]. In delineating the benefits which flow from an insurance contract relationship we must recognize that in buying insurance an insured usually does not seek to realize a commercial advantage, but, instead, seeks protection and security from economic catastrophe. *Noble v. National*

*American Life Ins. Co.,* [128 Ariz. 188, 189] [624 P.2d 866, 867 (1981) ]; *Egan v. Mutual of Omaha Ins. Co.,* [24 Cal.3d 809, 169 Cal.Rptr. 691, 695] [620 P.2d 141, 145 (1979), *cert. denied,* 445 U.S. 912] [100 S.Ct. 1271, 63 L.Ed.2d 597] (1980); *Crisci v. Security Ins. Co.,* [66 Cal.2d 425, 58 Cal.Rptr. 13, 19] 426 P.2d 173, 179 (1967) ]. Thus, the insured's objective in buying the company's express covenant to pay claims is security from financial loss which he [or she] may sustain from claims against him [or her] and protection against economic catastrophe in those situations in which he [or she] may be the victim. *Noble*[, 128 Ariz. at 189] 624 P.2d at 867; *Chavers v. National Security Fire & Cas. Co.,* 405 So.2d 1, 6 (Ala.1981). In both cases, he [or she] seeks peace of mind from the fears that accompany such exposure.

Because of the disparity in bargaining power and the nature of the contract, the insurer receives both premium and control. *Barrera v. State Farm Mutual Automobile Ins. Co.,* [71 Cal.2d 659, 79 Cal.Rptr. 106, 117] 456 P.2d 674, 685 (1969) ]. Thus, in third-party situations, the insured surrenders to the insurer the right to control and manage the defense of claims made against him [or her]. *See Parsons v. Continental National American Group,* [113 Ariz. 223] 550 P.2d 94 (1976) ]. In first-party situations the insurer sets the conditions for both presentment and payment of claims. In both first- and third-party situations the contract and the nature of the relationship effectively give the insurer an almost adjudicatory responsibility. The insurer evaluates the claim, determines whether it falls within the coverage provided, assesses its monetary value, decides on its validity and passes upon payment. Although the insured is not without remedies if he [or she] disagrees with the insurer, the very invocation of those remedies detracts significantly from the protection or security which was the object of the transaction. Thus, the insurance contract and the relationship it creates contain more than the company's bare promise to pay certain claims when forced to do so; implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured. *Parsons v. Continental National American Group, supra, Egan v. Mutual of Omaha Ins. Co., supra.*

*Rawlings v. Apodaca,* 151 Ariz. 149, 154–55, 726 P.2d 565, 570–71 (1986) (footnote omitted).

■ Therefore, while an insurer in the first-party situation does not have the same "control" of the insured's side of the litigation that would give rise to a fiduciary duty,

[i]t does not necessarily follow that the insurer is completely free of any obligation of good faith and fair dealing to its insured, since the ... duty [of good faith and fair dealing] is based on the reasonable expectations of the insured and the unequal bargaining positions of the contractants, rather than the insurance company's "control" of the litigation.

*Craft v. Economy Fire & Cas. Co.,* 572 F.2d 565, 569 (7th Cir.1978). Accordingly, we reject the argument that, absent a fiduciary relationship, an insured can only bring a bad faith cause of action in contract.

### 2. *Hawai'i Case Law*

The issue of tort liability arising from a contractual relationship is not new in this jurisdiction. In *Goo v. Continental Cas. Company,* 52 Haw. 235, 473 P.2d 563 (1970), this court considered merging tort and contract principles when we addressed the issue of whether punitive damages should be recoverable for breach of contract. We discussed the public policy reasons underlying punitive damages and acknowledged that Hawai'i allows punitive damages for "wilful, malicious, wanton or aggravated wrongs where a defendant has acted with a reckless indifference to the rights of another." *Id.* at 239, 473 P.2d at 566 (citing *Bright v. Quinn,* 20 Haw. 504 (1911); *Howell v. Associated Hotels, Ltd.,* 40 Haw. 492 (1954); *Glover, Ltd. v. Fong,* 40 Haw. 503 (1954)). In addition, we noted that a small but growing number of jurisdictions allow juries to award punitive damages in appropriate contract cases, *Goo,* 52 Haw. at 240, 473 P.2d at 566 (citations omitted), and that "[t]he scope of what is recognized by common law courts as a tort has grown so that torts and contract are no longer distinct, rather they overlap." *Id.* at

240–41, 473 P.2d at 567 (citations and footnote omitted). However, because the facts in *Goo* did not warrant an award of punitive damages, we declined to expressly decide whether punitive damages were recoverable in a claim based upon breach of contract.

Two years later, in *Dold v. Outrigger Hotel*, 54 Haw. 18, 501 P.2d 368 (1972), we held that tort damages may be allowed for certain wilful or reckless contractual breaches. In *Dold*, we stated:

> [T]he plaintiffs are not limited to the narrow traditional contractual remedy of out-of-pocket losses alone. We have recognized the fact that certain situations are so disposed as to present the fusion of the doctrines of tort and contract. Though some courts have strained the traditional concept of compensatory damages in contract to include damages for emotional distress and disappointment, we are of the opinion that where a contract is breached in a wanton and reckless manner as to result in a tortious injury, the aggrieved party is entitled to recover in tort.

*Id.* at 22, 501 P.2d at 371–72 (citations omitted). Although the facts in *Dold* did not warrant punitive damages, *Dold* established that Hawai'i permitted a tort recovery for certain types of contractual breaches. *See Amfac, Inc. v. Waikiki Beachcomber Inv. Co., Ltd.*, 74 Haw. 85, 139 n. 23, 839 P.2d 10, 37 n. 23, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992).

### 3. *Recognizing the Tort of Bad Faith in the Insurance Context*

■ The tort remedy recognized in *Dold* was premised on a *tortious breach of contract theory*. Penn contends, therefore, that allowing tort damages for breach of the implied covenant of good faith and fair dealing is unnecessary in this jurisdiction because of the availability of a tort remedy in a breach of contract action, *i.e.*, tortious breach of contract. We disagree.

Under *Dold*, compensatory tort damages are available for certain wilful or reckless contractual breaches. In addition, our decision in *Dold* implied that we would allow punitive damages in a tortious breach of contract action under the proper factual situation. However, the tort of bad faith is not a tortious breach of contract, but rather a separate and distinct wrong "which results from the breach of a duty imposed as a consequence of the relationship established by contract." *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 271 N.W.2d 368, 374 (1978). Therefore, the tort of bad faith allows an insured to recover even if the insurer performs the express covenant to pay claims. As such, an insurer could be liable for the tort of bad faith for certain conduct where it would not be liable for a tortious breach of contract. Accordingly, we conclude that the tortious breach of contract action we established in *Dold* is distinguishable from the tort of bad faith.

If the implied covenant of good faith and fair dealing, implied in *all* contracts, is the legal principle underlying the adoption of a bad faith tort cause of action in the insurance context, a logical concern is that such a holding will open the floodgates for tort actions based upon the breach of any contract. *See Kewin v. Massachusetts Mutual*, 409 Mich. 401, 295 N.W.2d 50 (1980). However, "[b]ecause of the nature of first-party insurance contracts, that concern is unfounded. The public interest in insurance contracts, the nature of insurance contracts, and the inequity in bargaining power between the insurer and the policyholder all serve to distinguish insurance contracts from other types of contracts." *Braesch v. Union Ins. Co.*, 237 Neb. 44, 464 N.W.2d 769, 774 (1991). Moreover,

> [t]ort actions for breach of covenants implied in certain types of contractual relationships are most often recognized where the type of contract involved is one in which the plaintiff seeks something more than commercial advantage or profit from the defendant. When dealing with an innkeeper, a common carrier, a lawyer, a doctor or an insurer, the client/customer seeks service, security, peace of mind, protection or some other intangible. These types of contracts create special, partly noncommercial relationships, and when the provider of the service fails to provide the very item which was the implicit objective of the making of the contract, then contract damages are seldom adequate, and the cases

have generally permitted the plaintiff to maintain an action in tort as well as contract.

*Rawlings,* 151 Ariz. at 159, 726 P.2d at 575 (citing W. Prosser & W. Keeton, *Law of Torts* § 92 at 660–61 (5th ed. 1984)).

We agree that the policy considerations surrounding the adoption of the tort of bad faith in the insurance context are atypical and will not necessarily extend to all types of contracts. Thus, the availability of a tort recovery for breach of the implied covenant of good faith and fair dealing may be justified in actions brought on insurance contracts, but not necessarily in actions brought on other types of contract.

We are also persuaded that there are sound reasons for recognizing a cause of action in tort for breach of the implied covenant of good faith and fair dealing in the insurance context. Adopting the tort of bad faith is consistent with the case law and statutory provisions dealing with insurer misconduct in this jurisdiction. In addition, the special relationship between insurer and insured is, as the *Rawlings* court observed, atypical, and the adhesionary aspects of an insurance contract further justify the availability of a tort recovery. Finally, a bad faith cause of action in tort will provide the necessary compensation to the insured for all damage suffered as a result of insurer misconduct. Without the threat of a tort action, insurance companies have little incentive to promptly pay proceeds rightfully due to their insureds, as they stand to lose very little by delaying payment.

■ Accordingly, we hold that there is a legal duty, implied in a first- and third-party insurance contract, that the insurer must act in good faith in dealing with its insured, and a breach of that duty of good faith gives rise to an independent tort cause of action. The breach of the express covenant to pay claims, however, is not the *sine qua non* for an action for breach of the implied covenant of good faith and fair dealing. *Rawlings,* 151 Ariz. at 157, 726 P.2d at 573. "The implied covenant is breached, whether the carrier pays the claim or not, when its conduct damages the very protection or security which

the insured sought to gain by buying insurance." *Id.*

Because the instant case involves a first-party insurance contract, we now address the proper standard for imposing liability in the first-party context.

### D. Standard for First–Party Bad Faith Cause of Action in Tort

Although a majority of jurisdictions recognize a first-party bad faith cause of action, there is a significant variation in the standards by which liability is imposed. In *Gruenberg,* the court stated that an insurer may face liability under a bad faith tort action if it "fails to deal fairly and in good faith with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy." *Gruenberg,* 108 Cal.Rptr. at 485, 510 P.2d at 1037. However, the court did not enunciate a precise standard for determining insurer bad faith in first-party situations. Similarly, in *Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 157 Cal.Rptr. 482, 620 P.2d 141 (1979), the Supreme Court of California utilized a general standard by which it held an insurer liable for its failure to properly investigate a disability claim. The court stated that "in the context of disability policies, an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation of its denial." *Id.* 157 Cal.Rptr. at 486–87, 598 P.2d at 146. Some courts that have adopted the tort of bad faith impose a standard similar to the *Gruenberg* and *Egan* approach, *see e.g., Nichols v. State Farm Mutual Automobile Ins. Co.,* 279 S.C. 336, 306 S.E.2d 616 (1983) ("[I]f an insured can demonstrate bad faith or *unreasonable* action by the insurer in processing a claim under their mutually binding insurance contract, he [or she] can recover consequential damages in a tort action."). Other courts impose a very stringent standard for establishing tort liability in first-party cases. *See, e.g., Aetna v. Broadway Arms,* 281 Ark. 128, 664 S.W.2d 463, 465 (1984) (requiring plaintiffs to demonstrate that the insurer's conduct was dishonest, malicious, or oppressive and not based on misjudgment or negligence); *National Savings Life Ins. Co. v. Dutton,* 419 So.2d 1357 (Ala. 1982) (plaintiff must be entitled to a directed

verdict on the contract claim); *McCorkle v. Great Atlantic Ins. Co.*, 637 P.2d 583, 587 (Okla.1981) (liability for the "intentional tort" of bad faith requires a clear showing that the insurer unreasonably, and in bad faith, withheld payment of the claim of its insured).

 We believe that the appropriate test to determine bad faith is the general standard set forth in *Gruenberg* and its progeny. Under the *Gruenberg* test, the insured need not show a conscious awareness of wrongdoing or unjustifiable conduct, nor an evil motive or intent to harm the insured. An unreasonable delay in payment of benefits will warrant recovery for compensatory damages under the *Gruenberg* test. *See McCormick v. Sentinel Life Ins. Co.*, 153 Cal.App.3d 1030, 200 Cal.Rptr. 732 (1984). However, conduct based on an interpretation of the insurance contract that is reasonable does not constitute bad faith. *See, e.g., Hanson v. Prudential Ins. Co. of Am.*, 772 F.2d 580 (9th Cir.1985) (applying California law); *Opsal v. United Servs. Auto. Ass'n*, 283 Cal. Rptr. 212 (Cal.Ct.App.1991); *Olive v. Great Am. Ins. Co.*, 76 N.C.App. 180, 333 S.E.2d 41 (1985). In addition, an erroneous decision not to pay a claim for benefits due under a policy does not by itself justify an award of compensatory damages. *Austero v. National Cas. Co.*, 84 Cal.App.3d 1, 148 Cal.Rptr. 653 (1978). Rather, the decision not to pay a claim must be in "bad faith." *California Shoppers Inc. v. Royal Globe Ins. Co.*, 175 Cal.App.3d 1, 221 Cal.Rptr. 171 (1985) (bad faith implies unfair dealing rather than mistaken judgment).

### E. *Punitive Damages*

In *Masaki v. General Motors Corp.*, 71 Haw. 1, 780 P.2d 566 (1989), we examined the remedy of punitive damages, its underlying purpose and rationale, and its compatibility with a products liability action. We noted that, despite substantial criticism, punitive damages remain firmly established in the common law " 'because [they] continue[ ] to serve the useful purposes of expressing society's disapproval of intolerable conduct and deterring such conduct where no other remedy would suffice.' " *Id.* at 8, 780 P.2d at 571 (citation omitted). Additionally, in analyzing the application of punitive damages in products liability cases, we noted the Wisconsin Supreme Court's reasoning in rejecting the argument that exemplary damages are incompatible with the underlying theories of negligence and strict liability:

This court has rested its analysis of punitive damages not on the classification of the underlying tort justifying compensatory damages, but rather on the nature of the wrongdoer's conduct. . . .

Punitive damages rest on allegations which, if proved, demonstrate a particular kind of conduct on the part of the wrongdoer, which has variously been characterized in our cases as malicious conduct or wilful or wanton conduct in reckless disregard of rights or interests.

*Id.* at 10, 780 P.2d at 572 (quoting *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 294 N.W.2d 437, 442 (1980)). We then delineated the types of conduct that may give rise to punitive damages as follows:

Such damages may be awarded in cases where the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations; or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences.

*Id.* at 11, 780 P.2d at 572 (citations and internal quotation marks omitted).

Thereafter, we concluded that, where the plaintiff proves the requisite aggravating conduct on the part of the defendant, the plaintiff may recover punitive damages in a products liability action based on the underlying theory of strict liability. *Id.* We found no logical or conceptual difficulty in allowing a claim for punitive damages in a products liability action based on strict liability. Similarly, we find no difficulty in allowing a claim for punitive damages in a bad faith tort cause of action based on the breach of the implied covenant of good faith and fair dealing. We noted in *Masaki* that this court has long recognized that punitive damages are recoverable in tort actions based on negligence. *Id.* at 10, 780 P.2d at 572. However, in *Masaki* we also recognized that "[o]ur deci-

sions further demonstrate that 'something more' than mere commission of a tort is required to justify the imposition of punitive damages[.]" *Id.* at 12, 780 P.2d at 573.

■ Accordingly, we hold that punitive damages may not be awarded in a bad faith tort case unless the evidence reflects "something more" than the conduct necessary to establish the tort. More specifically, the plaintiff must prove by clear and convincing evidence that "the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences." *Id.* at 11, 780 P.2d at 572 (citing *Bright v. Quinn,* 20 Haw. 504, 512 (1911)).

### F. *Remaining Issues on Appeal*

The trial court granted Best Place's motion for interlocutory appeal of several other pre-trial orders. We now address Best Place's additional claims and the issues raised in Penn's cross-appeal.

### 1. *Notice of Court's Intention to Allow Penn's Witnesses*

The complaint in this case was filed on June 20, 1988. Best Place filed a Pre-trial Statement on June 19, 1989. Penn did not file a Responsive Pre-trial Statement. Trial was set for the week of February 5, 1990. However, during the week of February 5, 1990, and two weeks thereafter, no courtroom was available, and the case was continued to the week of June 25, 1990.

Pursuant to Rules of the Circuit Courts of the State of Hawai'i (RCCH) Rule 12(r), the initial discovery cut-off date for this case was January 5, 1990. On March 29, 1990, Penn filed a motion for leave to conduct discovery. In addition, on April 19, 1990, and May 3, 1990, Penn filed its Naming of Witnesses and Naming of Additional Expert Witnesses.

On May 9, 1990, Judge Chun filed an order denying Penn's motion for leave to conduct discovery. Thereafter, on May 10, 1990, Best Place filed a motion to strike Penn's Naming of Witnesses and for order to exclude testimony of Penn's witnesses. On May 23, 1990, a hearing on Best Place's motion was held before Judge Klein. The following discussion transpired at the hearing:

THE COURT: I tell you what, I wasn't the one in January doing your [discovery] cut-off. I assume there were reasons for the discovery cut-off, and there [sic] shouldn't have discovery continue while the trial was continued. That's the battle you are going to have to take up with Judge Chun.

I am denying this subject to your straightening the discovery cut-off with Judge Chun.

[BEST PLACE'S COUNSEL]: Your Honor, I don't understand this. He made a motion in front of Judge Chun.

THE COURT: You got the answer, he can go back to Judge Chun to re-think the discovery cut-off then I will re-think this motion. But as of right now, this motion is denied.

[BEST PLACE'S COUNSEL]: Thnk [sic] you, Judge.

THE COURT: Okay.

[BEST PLACE'S COUNSEL]: May I ask the Court one question for clarification purposes. Is there a certain time limit we should go back and renew this discovery motion before Judge Chun?

THE COURT: If he doesn't get the discovery cut-off extended by Judge Chun, then he doesn't do any discovery, okay.

[BEST PLACE'S COUNSEL]: Does that then cut off his naming of witnesses?

THE COURT: It cuts off naming of witnesses until he gets that cleared up.

[BEST PLACE'S COUNSEL]: So basically your order is, unless Judge Chun extends discovery—

THE COURT: The witnesses are not going to be available to testify at trial or be discovered, okay.

On May 25, 1990, Penn filed a motion for leave for Best Place to conduct further discovery. A hearing on this motion was held before Judge Chun on May 30, 1990. On June 21, 1990, Judge Chun filed an order

granting in part Penn's motion for leave to allow Best Place to conduct further discovery. The order stated in relevant part:

> IT IS HEREBY ORDERED that Defendant Penn–America's "Motion for Leave to Allow Plaintiff The Best Place, Inc. To Conduct Further Discovery" is hereby granted as follows:

> Defendant Penn–America shall be permitted to name five (5) witnesses identified in its "Naming of Witnesses" and/or its "Naming of Additional Expert Witness", filed herein on April 19, 1990 and May 3, 1990, and plaintiff shall be permitted to depose those five witnesses.

Also on June 21, 1990, however, Judge Klein filed an order granting Best Place's motion to strike Penn's Naming of Witnesses and for order to exclude testimony of Penn's witnesses. The trial was rescheduled several times but ultimately was set for February 1992 before Judge Wilfred Watanabe.

Subsequent to the orders filed on June 21, 1990, by Judge Chun and Judge Klein, no motion regarding Penn's five witnesses was filed. However, at the hearings on the motions before Judge Watanabe held on August 6, 1991 and November 25, 1991, Best Place and Penn raised the issue of trial witnesses. Thereafter, Judge Watanabe issued a "Notice of Court's Intention to Allow Defendant Penn–America Insurance Company Five Identified Witnesses." The notice identified the five witnesses and was filed on March 24, 1992.

▮ Best Place contends that Judge Watanabe erred because: (1) the question of whether Penn could call witnesses was not properly before Judge Watanabe (*i.e.*, there was no motion before Judge Watanabe regarding Penn's witnesses); and (2) there was no "cogent" reason for ignoring Judge Klein's order of June 21, 1990. Essentially, Best Place contends that Judge Klein's order precluded Penn from introducing testimony from any defense witnesses. On cross-appeal, Penn contends that Judge Watanabe erroneously limited Penn to only five trial witnesses. We deem both of these contentions unpersuasive.

While we acknowledge that no motion was brought before Judge Watanabe on the issue of trial witnesses, the interpretation of prior pretrial orders is clearly within the purview of the trial judge assigned to the case. Although Judge Watanabe did not file an order regarding trial witnesses, his Notice of Court's Intention to Allow Defendant Penn–America Insurance Company Five Identified Witnesses effectively modified Judge Klein's order granting Best Place's motion to strike Penn's Naming of Witnesses and for order to exclude testimony of Penn's witnesses.

We have recognized in the past that the doctrine of "law of the case" is a rule of practice based on considerations of efficiency, courtesy, and comity. *Wong v. City & County of Honolulu*, 66 Haw. 389, 665 P.2d 157 (1983). Therefore, "[u]nless *cogent reasons* support the second court's action, any modification of a prior ruling of another court of equal and concurrent jurisdiction will be deemed an abuse of discretion." *Id.* at 396, 665 P.2d at 162 (citations omitted) (emphasis in original). The rule announced in *Wong*, however, does not preclude modification of prior rulings in all instances. *Matsushita v. Container Home Supply, Inc.*, 6 Haw.App. 439, 726 P.2d 273 (1986).

In the present case, Judge Watanabe's Notice of Court's Intention to Allow Defendant Penn–America Insurance Company Five Identified Witnesses directly contradicts Judge Klein's order granting Best Place's motion to strike Penn's Naming of Witnesses and for order to exclude testimony of Penn's witnesses. However, a review of the hearings held before Judge Klein on May 23, 1990, in conjunction with Judge Chun's order, indicates there were cogent reasons for modifying Judge Klein's ruling on Penn's trial witnesses.

Judge Klein specifically stated at the May 23, 1990 hearing that, if Penn did not get the discovery cut-off extended by Judge Chun, then Penn's naming of witnesses would be cut off. By implication, then, Judge Klein indicated that, if Penn did get the discovery cut-off extended, Penn would be allowed to name witnesses. Therefore, on June 21, 1990, when Judge Chun granted Penn's Motion for Leave to Allow Plaintiff The Best

Place, Inc. To Conduct Further Discovery, Best Place was on notice that Penn would be allowed to name five witnesses.[11] Because the trial did not commence during the week of June 25, 1990, but rather was continued to the week of December 10, 1990, Best Place had ample time to conduct discovery of Penn's five witnesses.

Accordingly, we hold that Judge Watanabe had cogent reasons for modifying Judge Klein's order, and, therefore, Judge Watanabe's "Notice of Court's Intention to Allow Defendant Penn–America Insurance Company Five Identified Witnesses" did not amount to an abuse of discretion.

### 2. Settlement Offer

In January 1990, at a settlement conference for this case, counsel for Penn communicated to counsel for Best Place an offer of settlement in the amount of $48,000.00. Best Place rejected this offer.

On August 5, 1991, Penn filed a motion in limine to exclude evidence of the settlement offer. Penn asserted that Best Place was precluded from introducing evidence of the offer under Hawai'i Rules of Evidence (HRE) Rule 408, which provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, or (3) mediation or attempts to mediate a claim which was disputed, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations or mediation proceedings is likewise not admissible.

On March 11, 1992, the trial court filed an order granting Penn's motion to exclude evidence regarding the settlement offer. The trial court's order stated in relevant part:

IT IS HEREBY ORDERED that Penn America Insurance Company's Motion in Limine re Admissibility of Settlement Offer is hereby granted and Plaintiff is precluded from using any pleadings, testimony, remarks, questions, or arguments that might inform the jury of the existence of Defendant Penn America's offer of $48,000 to Plaintiff in settlement of Plaintiff's claim on the fire insurance policy issued by Penn America.

Best Place contends that the trial court erred in precluding evidence of the settlement offer under HRE Rule 408.

"Traditionally, the rule concerning the admissibility of evidence.... is that the trial court is vested with discretion to admit or exclude evidence, and the court's discretion will not be reversed absent an abuse of that discretion." Kealoha v. County of Hawai'i, 74 Haw. 308, 313, 844 P.2d 670, 673, reconsideration denied, 74 Haw. 650, 847 P.2d 263 (1993) (citations omitted). However, we "have reviewed evidentiary rulings according to a standard other than abuse of discretion, depending on which particular rule of evidence was at issue." Id.

Based upon a review of the hearings, as well as the memorandum in support of Penn's motion to exclude evidence of the settlement offer, it appears that the trial court granted Penn's motion based on HRE Rule 408. The record in this case further indicates that the $48,000.00 offer clearly falls within the rule insofar as it constituted an offer of compromise or was made in compromise negotiations. However, such evidence is inadmissible only if it is used to prove liability for or invalidity of the claim or its amount. The only question remaining for the trial court, then, was whether the settlement offer would be used as such. Because the trial court would have had no discretion to admit the evidence if the settlement offer were being used to "prove liability for or

---

11. On cross-appeal, Penn contends that the lower court erroneously limited Penn to five trial witnesses. However, because Penn failed to comply with RCCH Rule 12(h) (Responsive Pretrial Statement), the trial court was under no obligation to allow any witnesses. Indeed, in the context of naming witnesses for trial, the matter

of extensions is addressed to the sound judgment of the trial court. See Wakuya v. Oahu Plumbing & Sheet Metal Ltd., 65 Haw. 592, 656 P.2d 84 (1982). In light of the length of the Penn's delay in naming witnesses, we hold that there was no abuse of discretion in allowing Penn only five witnesses.

invalidity of the claim or its amount," the trial court's ruling is reviewed under the right/wrong standard. *Kealoha,* 74 Haw. at 319, 844 P.2d at 676.

▮ Best Place argues that, although the settlement offer cannot be used to prove liability on the breach of contract claim, it should be admitted to show "bad faith" claims handling. Best Place cites *White v. Western Title Ins. Co.,* 40 Cal.3d 870, 221 Cal.Rptr. 509, 710 P.2d 309 (1985), as the principal case in support of its contention.

In *White,* the insured filed suit against a title insurer for breach of contract, negligence, and breach of the implied covenant of good faith and fair dealing. The court held that the insurer's two offers of settlement were admissible on the issue of breach of the duty of good faith and fair dealing. *White,* however, is clearly distinguishable because the insurer's offers of compromise were submitted before the insured had filed a claim for damages for breach of the covenant of good faith and fair dealing. In addition, both offers sought only to compromise the insured's original contract and negligence claim. *White,* then, should not be read as standing for the proposition that offers of settlement, while not admissible to prove contractual liability, are always admissible to prove liability for breach of the covenant of good faith and fair dealing. As stated by the California Court of Appeal, "[i]f an action or claim is pending based on a theory of bad faith violation of the covenant of good faith and fair dealing, and an offer to compromise the claim is made, we have no doubt that the offer would not be admissible in the subsequent lawsuit (unless some ground for admission could be established other than to show liability on the claim)." *Zeitounian v. Farmers Ins. Group,* 25 Cal.App.4th 929, 30 Cal. Rptr.2d 882, 887 (1994) (citation omitted).

In this case, Best Place filed suit on June 20, 1988, asserting breach of contract and tortious breach of the implied covenant of good faith and fair dealing. Penn's settlement offer in January 1990, then, sought to compromise Best Place's entire claim, including a claim for breach of the duty of good faith and fair dealing. Therefore, the settlement offer is not admissible under HRE 408.

Accordingly, we hold that trial court's determination that the offer would be used to "prove liability for or invalidity of the claim or its amount" was correct, and, therefore, the trial court did not err in granting Penn's motion to exclude evidence of the settlement offer.

### 3. *Waiver, Estoppel, and HRE 403*

The fire loss in this case occurred on or about June 21, 1987. Best Place timely notified Penn of the loss, and, by letter dated October 21, 1987, submitted a Sworn Statement in Proof of Loss. On December 15, 1987, Penn sent a letter to Best Place acknowledging receipt of Best Place's letter but contesting and rejecting the amounts set forth in the Proof of Loss. Penn's letter also requested that, by December 29, 1987, Best Place submit various documents pertaining to its business. The letter concluded as follows:

> On the condition that the above documents have been received in this office before the close of business hours on December 29, 1987, Penn–America requests that the insured submit to an examination under oath on any and all matters material to the rights and obligations of the parties with respect to the claim being made. That examination under oath will start at these offices on January 13, 1988 at 10:00 a.m. and will be conducted by a member of this firm in the presence of a court reporter. If it is impossible for the insured to attend the proceeding, please contact me as soon as possible to arrange for a mutually convenient date.
>
> Neither this letter nor any investigation, adjustment or proceeding mentioned above is intended to and shall not be construed as an admission or denial of liability on the part of Penn–America as to the claim being made nor as a waiver of any of the terms, provisions or conditions of the captioned contract of insurance, nor of any of the obligations of the insured, nor of any defense now or hereafter available to Penn–America.
>
> I especially call your attention to the requirement that the insured shall render

to the company a Proof of Loss within 60 days following the date of damage to or destruction of personal property.

Best Place did not comply with any of Penn's request. Instead, Best Place retained counsel who sent three letters to Penn's attorney dated February 3, 1988, February 19, 1988, and March 23, 1988. The three letters sought to ascertain the basis of Penn's prior requests, as well as an explanation for non-payment on Best Place's claim. No further communication transpired between the parties, and, on June 20, 1988, Best Place filed suit.

On August 5, 1991, Best Place filed a motion in limine to preclude evidence based on: (1) Penn's Waiver; (2) Estoppel; and (3) HRE Rule 403. Specifically, Best Place sought to exclude the following: (1) any and all evidence that the fire that damaged Best Place's property was an arson fire; (2) any and all evidence of any complicity of Best Place in causing the fire in question; (3) any and all evidence of Best Place's financial condition at the time of the fire; and (4) any and all evidence of Best Place's alleged breach of duty under the insurance contract.

On March 12, 1992, the trial court filed an order granting Best Place's motion to exclude evidence based on waiver, estoppel, and HRE Rule 403. Unfortunately, a review of the record does not indicate the trial court's precise basis for its ruling. Accordingly, we examine each of the grounds asserted for exclusion and analyze the issues accordingly.

The underlying premise of Best Place's motion to exclude evidence of arson and breach of contractual duties is that Penn's failure to respond constituted a denial of the claim and a waiver of certain defenses. The first issue we must address, then, is whether Penn's failure to respond to the three letters sent by Best Place's attorney constituted a denial of Best Place's claim. Determining the legal effect of an insurer's failure to respond to its insured is a question of law that we review *de novo*.

Best Place, citing *Ward v. Pacific Fire Ins. Co.*, 115 S.C. 53, 104 S.E. 316 (1920), contends that, unless there is a bona fide attempt to adjust a loss, there is, as a matter of law, a denial of the claim.

In *Ward*, the insurer failed to respond to three letters informing the insurer of its insured's fire loss. After approximately eight months from the date of the fire, the insurer had still not responded substantively to the letters informing it of the fire loss, and the insured brought suit. The insurer denied liability generally, and specifically on the ground, *inter alia*, that the insured had not furnished a proof of loss as required by the policy. Nevertheless, the insured prevailed at trial.

In affirming the judgment, the court in *Ward* rejected the insurer's contention that the trial court erred in refusing its motion for a directed verdict on the ground that plaintiff had not filed proofs of loss within the time required by the policy. The court reasoned that the insurer's denial of liability precluded the necessity of furnishing proofs of loss as required by the policy. In recognizing that the insurer had denied liability, the court stated that

[w]hile there was no express or unequivocal denial of liability during the period of time prescribed in the policy within which proofs of loss were to be and might have been furnished, yet defendant's silence, in the light of facts and circumstances, clearly warranted the inference that liability was and would be denied, as it was in fact denied, and plaintiff was warranted in so believing and in acting accordingly.

*Id.* 104 S.E. at 317.

As to the question whether an insurer's silence may be interpreted as a denial of a claim so as to constitute a waiver of a policy's proof of loss requirement, " '[i]t has been stated that unless there is a bona fide attempt by the [insurance] company to adjust a loss, there is a refusal to pay. Therefore, the mere effect of silence or inaction might be sufficient to excuse compliance.' " *Reeder v. Western Fire Ins. Co.*, 241 Ark. 731, 410 S.W.2d 122, 124 (1967) (quoting Appleman's *Insurance Law and Practice*, Volume 5, § 3633). We agree that a denial of a claim need not be express.

In this case, Penn failed to respond for over four months to three letters sent by the insured's attorney which sought information on the status of the claim and indicated a willingness to comply with Penn's future requests. Penn contends, however, that, because Best Place never submitted the information it requested in its original letter dated December 15, 1987, Penn was unable to decide whether to pay or deny the claim. Although Best Place failed to respond in a timely manner to the requests and obligations set forth in Penn's December 15, 1987 letter, we are not persuaded that Penn's letter released it from any further obligation under the policy.

Accordingly, we hold that the trial court was correct in concluding that Penn's failure to respond for over four months warranted an inference that Best Place's claim was denied.

We now turn to the issue whether Penn's denial of Best Place's claim precluded evidence relating to the defenses of arson and breach of duty under the policy in question. Best Place asserted waiver, estoppel, and HRE Rule 403 as the three grounds in support of its motion to exclude such evidence. We now address those grounds in turn.

We note at the outset that:

[i]n the context of insurance law, and especially with regard to limitation provisions in insurance policies, the terms "waiver" and "estoppel" have often been used without careful distinction, and thereby abused and confused. This doctrinal confusion, epitomized by the frequently echoed phrase "waiver by estoppel," is so deeply rooted some courts have suggested that the term waiver, as applied in Illinois to insurance cases, is simply another term for estoppel.

Notwithstanding the confusion already engendered by any of these cases, it is elementary that waiver and estoppel are two separate and distinct doctrines. The fact that these doctrines are closely akin and often may coexist does not mean they are identical in connotation.

Waiver encompasses either an express or implied voluntary and intentional relinquishment of a known and existing right.

Waiver is essentially unilateral in character, focusing only upon the acts and conduct of the insurer. Prejudice ... or detrimental reliance is *not* required.

Equitable estoppel, on the other hand, generally is based upon an insurance carrier's conduct and/or representations which misled an insured to his [or her] detriment.

*Salloum Foods & Liquor, Inc. v. Parliament Ins. Co.*, 69 Ill.App.3d 422, 26 Ill.Dec. 399, 403–04, 388 N.E.2d 23, 27–28 (1979) (citations and footnote omitted).

#### a. *Waiver*

As previously stated, "waiver is defined as an intentional relinquishment of a known right, a voluntary relinquishment of rights, and the relinquishment or refusal to use a right." *Estate of Janet Frances Searl*, 72 Haw. 222, 226–27, 811 P.2d 828, 831 (1991) (citation omitted). In addition, waiver may result from " 'such conduct as warrants an inference of [an intentional relinquishment of a known right], and it is not essential to its application that prejudice results to the party in whose favor the waiver operates.' " *Wilart Associates v. Kapiolani Plaza Ltd.*, 7 Haw.App. 354, 359, 766 P.2d 1207, 1210 (1988) (citation omitted).

Best Place contends that the following statement in its counsel's letter dated March 23, 1988, precipitated an intentional relinquishment by Penn of a known right:

If you do not respond to my February 3 inquiries by the end of my business day on March 30, 1988, I will take the position, on behalf of my client, that your company has waived its right to further investigation of the claim....

In our view, this statement standing alone, made by the party seeking to assert the doctrine of waiver, is not sufficient to establish an intentional relinquishment of a known right on the part of the party against whom the doctrine is sought to be enforced. Indeed, Penn's letter of December 15, 1987, expressly stated that Penn was not waiving "any of the terms, provisions or conditions of the captioned contract of insurance, nor of any of the obligations of the insured, nor of any defense now or hereafter available to

Penn–America." Therefore, Penn's failure to respond in a timely manner, standing alone, cannot be said to have been the equivalent of an intentional or voluntary relinquishment of any rights.

■ Penn's conduct with regard to the Proof of Loss, however, was inconsistent with statements in Penn's letter. If Penn intended to enforce the sixty-day time limitation for the proof of loss, it could have simply denied the claim on that basis alone. Instead, Penn chose to implicitly waive that provision as evidenced by its letter, which sought more information with respect to documents tending to establish the legitimacy of Best Place's claim. "[I]f an insurer receives and retains or acts upon notice or proofs of loss after the time specified in the policy for giving such notice or proofs has expired and fails within a reasonable time thereafter to object to the time within which such notice or proofs are furnished, it waives the delay, or at least an inference of waiver is justified from such conduct." 44 American Jurisprudence 2d 324 § 1390 (citations omitted). Therefore, as to the policy limitation on submitting proofs of loss, we hold that Penn's conduct warranted an inference that it was waiving the sixty-day time limitation and that it is precluded from introducing evidence of Best Place's breach of duty with regard to the Proofs of Loss.[12] However, because Penn did not intentionally relinquish any other rights or engage in conduct warranting an inference of such surrender, we further hold that Penn did not waive the defense of arson or evidence of any of Best Place's other obligations under the policy.

Accordingly, to the extent that the trial court relied on the doctrine of waiver to preclude evidence relating to the alleged breach of Best Place's duty to submit a timely proof of loss, we hold that the trial court was correct. However, to the extent that the trial court relied on the doctrine of waiver to preclude evidence of arson or any of Best Place's other obligations under the policy, we hold that the trial court was wrong.

### b. *Estoppel*

■ Best Place contends that an insurer who refuses to pay can only defend on the grounds stated in the denial. Consequently, Best Place contends that, because there were no articulated reasons for the denial, Penn is estopped from asserting any defenses. We disagree with Best Place's contention.

"[T]he general rule is that an insurer which denies liability on a specified ground may not thereafter shift the basis for its disclaimer to another ground known to it at the time of its original repudiation. . . .

The vast majority of jurisdictions recognize, however, that this rule of estoppel is limited in its application to those instances where the insured has suffered some degree of prejudice as a result of the insurer's attempt to shift its defense from one basis to another. This rule of estoppel "has its limitations and exceptions, which are as clearly established as the rule itself, one of which is that before the rule can apply it must appear that claimant was misled to his [or her] injury."

. . . . While it is true that an insurer's specification of one of several available grounds for disclaimer may be taken by the insured as an indication that the other grounds have been overlooked, as a basic matter of fairness we see no reason why this circumstance should operate to bar the later assertion of the other grounds for disclaimer where the insured cannot claim to have suffered any degree of prejudice. The overwhelming majority of American jurisdictions refuse to impose this sort of estoppel in the absence of prejudice, and it is clear that the rule as formulated continues to be valid.

*Guberman v. William Penn Life Ins. Co. of New York*, 146 A.D.2d 8, 538 N.Y.S.2d 571 (1989) (citations omitted). This jurisdiction is in accord with the foregoing views expressed in *Guberman. See Doherty v. Hartford Ins. Group*, 58 Haw. 570, 573, 574 P.2d 132, 134–35 (1978) ("One invoking equitable estoppel must show that he or she has detri-

12. To the extent that our prior holding in *Boardman v. Fireman's Fund Ins. Co.*, 14 Haw. 21 (1902), mandated that a waiver of the time limit for submitting proof of loss be in writing, it is expressly overruled.

mentally relied on the representation or conduct of the person sought to be estopped, and that such reliance was reasonable." (Citations omitted.)).

In this case, Penn never expressly denied Best Place's claim. Rather, the denial of the claim was inferred by Penn's failure to respond to Best Place's inquiries in a timely manner. Penn made absolutely no representation that it would assert a particular ground for disclaimer, or that any grounds had been overlooked. Furthermore, there is no indication that Best Place reasonably relied on Penn's silence to its detriment. Therefore, Best Place's theory of estoppel must fail.

Accordingly, to the extent that the trial court relied on the doctrine of estoppel to preclude any evidence, we hold that the trial court erred.

### c. HRE Rule 403

■ Penn fails to set forth any argument regarding the exclusion of evidence pursuant to HRE Rule 403.[13] Best Place, nevertheless, contends that the evidence it sought to exclude would be highly prejudicial and could mislead the jury whose focus should be on the stated reasons for the denial. We now proceed on the assumption that the trial court excluded the evidence based on HRE Rule 403.

A motion to exclude evidence based on HRE Rule 403, of course, requires the trial court to make a judgment call as to the probative value of the proffered evidence. We therefore review the trial court's ruling on the HRE 403 motion under the abuse of discretion standard as "the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a 'judgment call' on the part of the trial court." *Kealoha,* 74 Haw. at 319–20, 844 P.2d at 676.

Best Place sought to preclude evidence of: (1) arson; (2) Best Place's financial condition (which the jury might infer was a the motive for arson); and (3) Best Place's alleged breach of duties under the policy. Because we determine that, except for the evidence relating to Best Place's failure to timely submit proofs of loss, the doctrines of waiver and estoppel do not apply to the evidence that Best Place sought to exclude, such evidence is clearly probative of material issues in this case. Indeed, the defense of arson and breach of duty under the policy provisions go to the very heart of the issue whether Penn was warranted in denying the claim. Accordingly, we hold that its probative value clearly outweighs any prejudicial effect. Therefore, to the extent that the trial court based its ruling on HRE 403, we hold that the trial court abused its discretion.

### 4. Default and Sanctions

Finally, by order, the circuit court sanctioned Penn for acting in contravention of a circuit court order that denied Penn the opportunity to conduct further discovery.

The date of trial was initially set for February 5, 1990. Accordingly, discovery was to conclude on January 5, 1990, thirty days prior to the assigned trial date. RCCH Rule 12(r).[14] The trial was subsequently continued to a later date. On March 29, 1990, Penn filed a "motion for leave to conduct discovery." On May 9, 1990, the circuit court denied Penn's motion. The date for trial was repeatedly continued.

On August 6, 1991, Penn subpoenaed Best Place's former accountant, Larry Anderson, to appear at trial on the new scheduled date of August 8, 1991. Unbeknownst to Best Place, Anderson contacted Penn's counsel and informed counsel that he wanted to comply with the subpoena but that he would be on the mainland during the scheduled trial date. According to Anderson's affidavit,

---

13. HRE 403 provides:

 **Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consid-

 erations of undue delay, waste of time, or needless presentation of cumulative evidence. (Bold emphasis in original.)

14. RCCH Rule 12(r) provides: **"Discovery Cut Off.** Discovery shall be cut off 30 days before the assigned trial date."

142

Penn's counsel told Anderson to deliver Best Place's financial records to Penn's counsel's office and that Penn's counsel would review the records "to see if anything was relevant. [Anderson] complied with [Penn's counsel's] request and delivered three (3) storage boxes of records to him shortly thereafter." The trial did not take place and was again continued to a later date. Approximately one to two months later, Anderson contacted Penn's attorney and requested the return of the records. The records were then returned to Anderson. At no time did Penn's attorney advise Anderson to contact Best Place's counsel or the circuit court. Likewise, Penn's attorney did not contact Best Place's counsel to inform him that records had been submitted by Anderson.

The date of trial was again continued until February 10, 1992. On February 7, 1992, Penn delivered to Best Place's counsel copies of over nine-hundred pages of records that were copied from Anderson's records and were marked for identification as exhibits. On the assigned day of trial, February 10, 1992, Best Place filed a "motion for default and other sanctions" against Penn for violating the circuit court's May 9, 1990 order that denied Penn the opportunity to conduct further discovery. On the same day, arguments on the motion were presented in circuit court. On March 12, 1992, by order, the circuit court denied Best Place's motion for default, but granted Best Place's motion for sanctions and excluded from the record "all evidence of [Best Place's] financial condition, including but not limited to the records of Mr. Anderson and all testimony concerning those records or influenced by those records[.]" The circuit court also required Penn to pay Best Place "the sum of $250.00 as sanctions."

On appeal, Penn argues that it was erroneously sanctioned by the circuit court for reviewing Anderson's documents regarding Best Place's financial condition. Penn contends that reviewing the documents was not discovery, but, rather, it constituted a "preview" of a witness' records, and, therefore, did not violate the May 9, 1990 court order that denied Penn the opportunity to conduct further discovery. We disagree.

It is the inherent power of the court to sanction and punish attorneys for violating court orders. The circuit court is given broad discretion in granting such sanctions. *See e.g., Wong,* 66 Haw. at 394, 665 P.2d at 161. The May 9, 1990 circuit court order clearly informed Penn that it was to refrain from conducting further discovery. Penn contends that "previewing" Anderson's documents of Best Place's financial condition was not discovery. However, HRCP Rule 26(a) provides in relevant part that "parties [ ] obtain discovery by ... production of documents ... for inspection and other purposes." Clearly, Penn conducted discovery by telling Anderson to turn over the documents so that they could be inspected. Thus, Penn clearly disobeyed the May 9, 1990 court order. Additionally, Penn's failure to notify Best Place of Anderson's surrender of the records prior to the Friday before the scheduled Monday trial exacerbated the prejudicial effect on Best Place that resulted from Penn's violation of the court's order.

Penn further contends that the sanctions were too severe. Penn argues that, if sanctions were warranted, they should be limited to either a monetary fine or an exclusion of the Anderson records, rather than the exclusion of all financial records of Best Place.

A review of the record indicates that Penn violated the May 9, 1990 court order by conducting discovery after the court ordered Penn to refrain from doing so. Then, Penn failed to inform Best Place that it conducted discovery. Finally, Penn withheld the documents from Best Place for over five months and finally submitted them to Best Place on the Friday before the scheduled Monday trial. Based on the egregious nature of the disobedience, we hold that the sanctions levied against Penn were warranted. If the circuit court had limited its sanctions by levying only a monetary penalty or by excluding only the Anderson documents Penn had obtained in contravention of the court order, there would have been little effect on Penn. Limiting the sanctions in this case would have left counsel for Penn in the same position had he not violated the court order at the onset.

Accordingly, we hold the circuit court did not abuse its discretion in sanctioning Penn and excluding from the record all evidence of Best Place's financial condition.

## IV. CONCLUSION

For the foregoing reasons, we vacate the circuit court order granting Penn's motion in limine regarding tortious bad faith and hold that Hawai'i recognizes the tort of bad faith in the first-party insurance context. We affirm Judge Watanabe's order, modifying Judge Klein's order, allowing five identified witnesses to appear at trial. We affirm the circuit court order granting Penn's motion to exclude evidence of the settlement offer. We affirm the circuit court order, based on the doctrine of waiver, precluding evidence relating to the alleged breach of Best Place's duty to submit a timely proof of loss; however, we vacate the circuit court order, based on the doctrine of waiver, precluding evidence of arson or any of Best Place's other obligations under the policy. We vacate the circuit court order granting Best Place's motion to exclude evidence based on estoppel and HRE Rule 403. We hold that the circuit court did not abuse its discretion in sanctioning Penn and excluding from the record all evidence of Best Place's financial condition. Finally, we affirm all of the remaining circuit court orders that are on appeal.