978 P.2d 179

**Edwin G. GAMATA, Plaintiff–Appellant,**

v.

**ALLSTATE INSURANCE COMPANY, an Illinois corporation, Defendant–Appellee.**

**No. 21614.**

Intermediate Court of Appeals of Hawai'i.

April 28, 1999.

Ian L. Mattoch, Honolulu, and Jonathan S. Kuba, on the briefs, for plaintiff-appellant.

J. Patrick Gallagher, Wayne S. Sakamoto, Joelle Segawa Kane, Leonard R. Gouveia, Jr., and Ryan K. Harimoto (Gallagher & Sakamoto), on the briefs, Honolulu, for defendant-appellee.

BURNS, C.J., WATANABE, and ACOBA, JJ.

Opinion of the Court by ACOBA, J.

We hold that under the Hawai'i motor vehicle insurance law, Hawai'i Revised Statutes' (HRS) chapter 431:10C (1993) (the no-fault law), no-fault benefits are expenses which are appropriate, reasonable and necessarily incurred and are not restricted to treatment characterized as "curative" as opposed to "palliative."

We conclude that when it affirmed denial by Defendant–Appellee Allstate Insurance Company (Allstate) of no-fault coverage for medical treatment sought by Allstate's insured, Plaintiff–Appellant Edwin G. Gamata (Plaintiff), the district court of the first circuit (the court) ruled contrary to the foregoing proposition. Therefore, we vacate the court's March 5, 1998 oral order and the May 1, 1998 judgment to that effect.

We note that after filing his complaint, Plaintiff proceeded with and paid for the contested treatment despite Allstate's denial of coverage. In light of Wilson v. AIG Hawaii Ins. Co., 89 Hawai'i 45, 968 P.2d 647 (1998), decided during the pendency of this appeal, we hold, further, that the provider of the treatment, Dr. Bernard Portner (Dr. Portner), and not Plaintiff, is the real party in interest with respect to any action against Allstate for reimbursement of the treatment costs. We instruct, then, that on remand, any payments made by Plaintiff to Dr. Portner must be returned to Plaintiff, and that Dr. Portner may be joined or substituted as a party plaintiff, as the case may be, if he seeks reimbursement from Allstate.

With respect to Plaintiff, we conclude that he may be a real party in interest for the purpose of establishing that the treatment costs should be included in calculating the statutory dollar threshold for bringing an action in tort. See id. at 50, 968 P.2d at 652. Under the circumstances of this case, we

direct that on remand Plaintiff shall be afforded leave to amend his pleadings to assert that Allstate's denial jeopardized his right to sue in tort, if he desires to do so.

Finally, in the event that Plaintiff and/or Dr. Portner pursue(s) his or their claim(s) on remand, we conclude that (1) evidence of Dr. Portner's purpose and reasons for recommending the contested treatments would be relevant in determining whether Allstate's denial was proper, and (2) evidence of Plaintiff's post-denial treatment and condition would be relevant to a claim that Allstate's denial was premature.

## I.

Plaintiff was involved in a motor vehicle collision on March 28, 1997, in the City and County of Honolulu. Following this accident, Plaintiff received medical treatment from Dr. Portner from April 24, 1997 through, at least, December 19, 1997. Apparently, Allstate paid for the treatment from April 24, 1997 through October 13, 1997 only.

In a "Denial of Claim" form dated October 13, 1997, Allstate informed Plaintiff that he "was not entitled to any benefits under the Hawai'i No-Fault Law for the following reason(s): Pursuant to [the independent medical examination (IME) report of Dr. David Sheetz (Dr. Sheetz)] dated September 5, 1997, and the records available in your claim

file, your continued complaints are not due to the ... accident[.]" The form notified Plaintiff that if he "wish[ed] to contest this determination," he had, among other options, the right to "bring court action against ... Allstate[.]"[1]

Dr. Portner subsequently submitted two "treatment plans" to Allstate dated November 3, 1997. The first treatment plan requested a magnetic resonance imaging[2] (MRI) of Plaintiff's cervical spine and was to be administered sometime during the period from November 13, 1997 to December 20, 1997. The second treatment plan requested a "select nerve root block injection"[3] (the nerve root injection) and was to be administered during the same time period.

In a letter dated November 12, 1997, Allstate acknowledged receipt of the two plans but "advised that [it would] no longer accept [Dr. Portner's] treatment plans for [Plaintiff] as the IME disclosed that [Plaintiff's] current complaints are not attributable to the ... accident[.]"

Plaintiff filed his complaint against Allstate on November 18, 1997. The complaint alleged Plaintiff had suffered personal injuries in the accident, and that Allstate's denial "violat[ed its] statutory and contractual duties[4] to provide no-fault benefits [under HRS § 431:10C-303(a)][5] to or on behalf of Plaintiff[.]"

---

1. Under the Hawai'i motor vehicle insurance law, Hawai'i Revised Statutes (HRS) chapter 431:10C (1993) (the no-fault law), a claimant can choose to seek review of an insurer's denial of benefits by either (1) administrative hearing pursuant to HRS § 431:10C-212, (2) arbitration pursuant to HRS § 431:10C-213, or (3) lawsuit in a state court of competent jurisdiction pursuant to HRS § 431:10C-314.

2. A magnetic resonance imaging (MRI) is defined as a "diagnostic tool" involving the "[u]se of radio waves and strong magnetic fields to detect physical and chemical variations within body tissues." *Modern Dictionary for the Legal Profession* 503 (Supp.1998).

3. At trial, Dr. Bernard Portner (Dr. Portner) explained that generally, a "select nerve root block injection" is a procedure in which medication is injected directly around the covering of specific nerve endings to treat suspected irritation of the nerve root.

4. Pursuant to HRS § 431:10C-314, "[a]ny person may bring suit for breach of any contractual obligation assumed by an insurer under a policy of insurance containing such mandatory or optional provisions in any state court of competent jurisdiction." The record on appeal does not contain a copy of the no-fault insurance policy at issue in this case.

5. Under HRS § 431:10C-303(a), "[i]f the accident causing accidental harm occurs in this State, every person insured under this article, and such person's survivors, suffering loss from accidental harm arising out of the operation, maintenance, or use of a motor vehicle, has a right to no-fault benefits."

As a result of a 1997 amendment to HRS § 431:10C-303(a), the words "personal injury protection" were substituted for the word "no-fault." 1997 Haw. Sess. L. Act 251, § 40, at 538; see HRS § 431:10C-303 (Supp.1998). That amendment, however, was not effective until January 1, 1998, and does not affect the disposition of this appeal.

Despite Allstate's rejection of the treatment plans, the MRI was performed on December 19, 1997,[6] and Dr. Portner performed the nerve root injection on November 21, 1997. According to the record, the amount outstanding on Plaintiff's account with Dr. Portner following these two treatments was $1,658.80.[7] In a court memorandum filed subsequent to trial, Plaintiff represented that he had paid Dr. Portner for these medical services; however, the record does not indicate exactly when or how much Plaintiff paid the doctor. *See infra* at p. 219, 978 P.2d at p. 185.

## II.

### A.

The case was tried on February 26 and March 5, 1998. In his trial memorandum, Plaintiff contended that the issues presented to the court were whether "(1) Plaintiff's injuries were a result of the March 28, 1997 accident, and (2) the treatment prescribed by ... [Dr.] Portner ... was reasonable, appropriate and necessary."

Allstate's trial memorandum presented three theories of defense: (1) "Plaintiff's condition at the time of the denial was not and is not attributable to the subject accident"[;] (2) the court should not consider evidence "available to the parties subsequent to Allstate's denial of treatment on October 13, 1997, Allstate's letter to [Dr. Portner] on November 12, 1997, and/or the filing of the [c]omplaint"[;] and (3) "if the court finds that Plaintiff's condition was attributable to the subject accident," it should apply the "recovery standard" as opposed to the "pain management standard."

In support of its second defense theory, Allstate cited to several Hawai'i Insurance Commissioner rulings which concluded that review of an insurer's no-fault denial is retrospective only as of the date of the denial. In support of its third defense theory, Allstate argued that the no-fault law did not authorize treatment that was "merely for comfort and pain management[.]" Allstate cited to a first circuit court order entered on February 3, 1997 in *AIG Hawaii Ins. Co. v. Yucoco*, Civil No. 96–2393–06 (the *Yucoco* order). While Allstate's trial memorandum does not supply a ready definition of the distinction between a recovery and a pain management standard, the *Yucoco* order, attached as an exhibit to it's trial memorandum, explained that "a person's entitlement to no-fault benefits ... should be determined by whether or not the treatment contributes to the recovery process[.]"

### B.

On the first day of trial, Allstate orally moved in limine to exclude "any evidence" of matters which "occurred subsequent" to October 13, 1997 as "irrelevant" and requested that the court "focus[ ] ... on the information available to Allstate at the time it issued the denial."

In response, Plaintiff contended that Dr. Portner's post-denial treatment was relevant to whether Plaintiff's "injuries [were] related to his accident" and "Dr. Portner's treatment was, in fact, reasonable." Responding similarly to Allstate's third theory, Plaintiff maintained that "we need to see how [Plaintiff] ... reacted to the [post-denial] treatment" to "know whether or not the treatment was curative or palliative."[8]

The court ruled in favor of Allstate, and ordered that Dr. Portner not "give testimony subsequent to the October 13, 1997 denial."

---

6. From the record, it appears that the MRI was performed on Plaintiff at Straub Clinic & Hospital. It is not clear whether Dr. Portner performed or was otherwise involved with administering the MRI.

7. This fact is taken from a document entitled "PATIENT FINANCIAL HISTORY BY DT SERVICE PORTNER ORTHOPEDIC REHABILITATION" (the financial history) dated February 19, 1998, which was stipulated into evidence as Plaintiff's Exhibit 4. The financial history does not indicate whether any or all of the amount outstanding was subsequently paid.

8. The term "curative" refers to treatment that "tend[s] to cure[.]" *Webster's Third New International Dictionary* 555 (1981). On the other hand, "palliative" is said to be treatment that "ease[s pain] without curing." *Id.* at 1625–26.

## C.

Plaintiff filed a motion for reconsideration of the in limine order and at the reconsideration hearing, argued that "if [Plaintiff] cannot present any evidence subsequent to the denial, then he will never be able to challenge a denial by Allstate for any further benefits."

Allstate, on the other hand, urged that post-denial evidence was not relevant, and "the argument that [Plaintiff] would never be able to challenge a denial of future benefits is just flat wrong." According to Allstate, "[i]f an insure[r] denies benefits at a time which is arguably too early, there would be and should be credible evidence that the denial was improper at the time it was issued."

The court acknowledged that it "unders[tood] ... [Plaintiff] incurred the bills [for the MRI and the nerve root injection] and that [Plaintiff is] saying Allstate should have paid for the bills because they were reasonable, appropriate or necessary."

The court again ruled in Allstate's favor, finding that Plaintiff's breach of contract claim related only to "Allstate's decision at a particular point in time[,]" i.e., the time of the denial.[9]

During trial, Plaintiff did not make an offer of proof[10] as to the substance of the excluded evidence.[11]

## D.

At trial, Dr. Portner testified that when he first examined Plaintiff on April 24, 1997, Plaintiff was complaining of "left-sided neck pain" and headaches. Dr. Portner opined that the subject accident caused Plaintiff's symptoms:

Q [Counsel for Plaintiff] Did [Plaintiff] tell you anything significant, any prior injuries?

A [Dr. Portner] He did not have any.

Q What did your history reveal about the cause of his symptoms?

A That he was involved in a motor vehicle accident on March 28th [1997].

. . . .

Q So, at that time [ (the time of the examination) ], the history and examination reflect[,] in your opinion[,] to a reasonable degree of medical certainty[,] that the automobile accident was the cause of [Plaintiff's] present complaints?

A *Yes, based on the history that he gave me that he didn't have neck pain[s] before the accident, and then he had them shortly afterwards, it was pretty obvious to me that there was a causal relationship.*

(Emphasis added.) During direct examination, Dr. Portner stated that "one never knows if its [sic] treatment that made somebody better or the passage of time and his own healing properties of his body." However, Dr. Portner also asserted that the treatment he requested and provided prior to

**9.** In his complaint, Plaintiff alleged that the breach of contract occurred on October 13, 1997. However, during trial Plaintiff argued that the breach occurred after Plaintiff incurred the bills and Allstate refused to pay those bills. The record does not indicate whether Allstate was presented with any bills, and if so, when Allstate refused to pay them. As set out previously, Plaintiff filed his complaint prior to receiving the MRI or the nerve root block injection. *See supra* at pp. 215–216, 978 P.2d at pp. 181–182.

**10.** Hawai'i Rules of Evidence (HRE) Rule 103 (1993) provides, in relevant part:
    (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
    . . . .
    (2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.
    . . . .
    (d) Plain error. Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.

**11.** The record does not contain evidence as to the substance of the post-October 13, 1997 evidence, except that an assertion with respect to the salutary effect of subsequent treatment was made in counsel's affidavit supporting Plaintiff's request for fees and costs. *See infra* at pp. 219–220, 978 P.2d at pp. 185–186.

    Under our disposition of this case, we need not decide whether Plaintiff's failure to make an offer of proof precluded his claim of error, or whether plain error should be noticed.

Allstate's denial was appropriate, reasonable, and necessary.

Plaintiff testified that on the day of the accident he began to feel pain in his neck, and that the headaches began one to two days after the accident. He reported that Dr. Portner's pre-denial treatment eased the pain for "a week or so, seven or eight days" at a time. Before that, the pain level, on a scale of one through ten, was "high, to eight or nine[,]" and after a few weeks of treatment the pain level dropped to "five or six[.]" According to Plaintiff, this helped him "a lot."

Plaintiff also related that he underwent the MRI. As an apparent result of the court's in limine order, Plaintiff did not testify as to the MRI results, the nerve root injection, or the effect of such treatment.

During cross-examination, Plaintiff confirmed that he had previously injured his right foot in 1992, his right shoulder while at work on August 11, 1994, and that he slipped and fell while working on April 4, 1995.[12] Plaintiff did not testify to any neck pain or headaches resulting from these incidents.

Dr. Sheetz opined that treatment of Plaintiff after the denial would be inappropriate because he "[didn't] see any injuries that could be reasonably related to [the] . . . accident." According to Dr. Sheetz, Plaintiff's complaints were motivated by "secondary-gain issues" such as financial gain, and that such "psychosocial factors" should be considered in examining and treating a patient. Dr. Sheetz asserted that after Allstate's denial, further no-fault treatment was not "necessary" and would not have been "appropriate" or "reasonable." During cross-examination, Dr. Sheetz declared that had he been treating Plaintiff, he would have ceased treatment long before Dr. Portner did, because "by agreeing to see a patient under no-fault, you are, in fact, stating that you believe . . . the motor vehicle accident is responsible for his [or her] present symptoms[.]"

At the close of trial, the court decided that Plaintiff had not proven a violation of his right to no-fault benefits because (1) no strong correlation between Dr. Portner's treatment and Plaintiff's improvement existed, (2) any pain relief was only temporary, and (3) Plaintiff was not a "hundred per cent" prior to the subject accident: [13]

All right. Plaintiff has filed a complaint. This is a complaint that was filed on November 18, 1997. Plaintiff claims that . . . Allstate's October 13, 1997[ ] denial of no-fault benefits to Plaintiff . . . constitutes a violation of . . . Allstate's statutory and contractual duties to provide no-fault benefits to or on behalf of Plaintiff[.]

. . . Plaintiff's burden of proof is to establish by a preponderance of the evidence that Allstate's October 13, 1997[ ] denial did violate [Plaintiff's] right under the Allstate policy to get no-fault benefits.

Now[,] preponderance of the evidence, if you look at the testimony that's been presented, we have Dr. Portner's testimony and Dr. Portner in particular says that *[Plaintiff's] improvement, he does not know whether it would be due to treatment or the passage of time.*

He also says that he's not sure[,] in terms of [Plaintiff's] return to work[,] whether it was due to treatment or passage of time. So even Dr. Portner himself could not say[,] in terms of [Plaintiff's] improvement or his ability to return to work[,] was due to either the treatment or just by [sic] passage of time, such that if he had no treatment, whether he could return to work on his own. It's not clear from Dr. Portner's own testimony.

[Plaintiff's] own testimony, in talking about the treatment that he received from Straub [Clinic & Hospital (Straub) and] from Dr. Portner for the physical therapy, *was only temporary relief, does not show a pattern of improvement in that the relief was only temporary for the physical therapy, that he got temporary relief, but that the same day, the pain returned.*

---

12. The transcript does not state the nature of the injury involved, but Dr. David A. Sheetz's independent medical examination report states that Plaintiff experienced "back pain" as a result of an April 4, 1995 accident.

13. The court did not file any written findings of fact or conclusions of law.

Also[,] for the injection[14] that he got from Dr. Portner, he also said was [sic] *temporary relief,* that the pain still returned after one week, seven to eight days.

So what we have here is we have just temporary relief from [Plaintiff]. [Plaintiff] also says that he wants to be pain free[,] *but he himself has testified that even before the automobile accident, he was not [a] hundred per cent and that may have been due to his prior disabilities, but he himself testified that he was not [a] hundred per cent prior to the accident in terms of functioning.*

In looking at Dr. Sheets' [sic] testimony, .Dr. Sheets [sic] has looked at all of the prior records and has elicited testimony from [Plaintiff] regarding his prior accident[s].

In hearing Dr. Portner's testimony, Dr. Portner has said that he has not reviewed Straub's records. *The question is why did he also recommend physical therapy, if after review, physical therapy only provided temporary relief[?] So the [c]ourt questions Dr. Portner's treatment plan.*

So this is the information Allstate had at the time that they [sic] denied—of their [sic] denial[,] October[ ] 1997. *So therefore the [c]ourt finds that Allstate's denial was proper.*

Based upon evidence that *they [sic] had[,] at the time of the denial,* Dr. Portner's treatment records, Dr. Sheets' [sic] IME examinations, a review of Straub's records, therefore, *the [c]ourt finds that denial was proper by Allstate.*

(Emphases added.)

On May 1, 1998, the court entered judgment in favor of Allstate and against Plaintiff.

### E.

Following trial, on March 17, 1998, Plaintiff filed a request for fees and costs, attached to which was counsel's affidavit as-

serting that attorney's fees, expert fees for Dr. Portner, and costs were justified because, among other reasons, Plaintiff's condition improved after receiving the contested treatments:

> Despite ... Allstate's denial of benefits, Plaintiff underwent the MRI and the nerve root ... injection. *The nerve root ... injection had the effect of curing Plaintiff's occipital headaches which significantly improved his condition.* With this knowledge, Plaintiff's counsel advised [Plaintiff] to go forward with the present no-fault action on the basis that Dr. Portner's diagnosis and treatment were reasonable, appropriate and necessarily incurred.

(Emphasis added.) The affidavit did not refer to any supporting documents or evidence.

On March 16, 1998, Allstate filed its request for costs and opposition memorandum to Plaintiff's request.[15] It argued, in relevant part, that Dr. Portner was not entitled to expert witness fees because he was "a real part[y] in interest" as his "bills for past and future treatment were at issue in the instant case."

On March 18, 1998, Plaintiff filed a reply memorandum in which he maintained he had already paid Dr. Portner's bills, and thus, Dr. Portner was not a real party in interest:

> Allstate assert[ed] that expert witness fees for testimony at trial should not be awarded because Dr. Portner is not a real party in interest. However, this is not the case. Dr. Portner does not have any interest in the outcome of this case *since he was already paid for his services by Plaintiff.* Dr. Portner wished to testify on Plaintiff's behalf because of the fact that he knew Plaintiff was genuinely suffering and that Defendant was shirking its duty.

(Emphasis added.)

The court denied Allstate's and Plaintiff's requests for costs, including expert witness fees for Dr. Portner, but partially granted Plaintiff's request for fees.

---

**14.** The court's reference to an "injection" concerned treatment by Dr. Portner prior to Allstate's denial.

**15.** Plaintiff's statement of fees and costs was not filed until March 17, 1998, one day after Allstate filed its request for costs and memorandum in opposition. The record, however, does not explain this discrepancy.

## III.

On appeal, Plaintiff contends that (1) evidence of post-October 13, 1997 treatment was relevant under Hawai'i Rules of Evidence (HRE) Rule 401 (1993), and (2) exclusion of such evidence violated HRS §§ 431:10C–303 and –314 and was against public policy. However, during the pendency of this appeal, the supreme court reversed the *Yucoco* order by memorandum opinion in *AIG v. Yucoco,* —— Hawai'i ——, 980 P.2d 997 (Haw.1998) (mem.), and also decided *Wilson.* In light of these decisions, we believe, based on our review of the record, that the pertinent issues to be decided are those that follow.

## IV.

While the court acted conscientiously, we believe it incorrectly applied HRS § 431:10C–103(10)(A)(i) and (ii).

An insurer's denial of no-fault benefits must be evaluated within the pertinent statutory framework. In that regard, HRS § 431:10C–303(a) provides, in relevant part, that "every person insured under [the no-fault law], ... suffering loss from accidental harm arising out of the operation, maintenance, or use of a motor vehicle, *has a right to no-fault benefits.*" (Emphasis added.) "Accidental harm" means "bodily injury ... *caused by a motor vehicle accident to a person.*" HRS § 431:10C–103(1) (emphasis added). No-fault benefits are defined under HRS § 431:10C–103(10)(A)(i) and (ii) to include "[a]ll *appropriate and reasonable expenses necessarily incurred* for medical" and other services. (Emphasis added.) HRS chapter 431:10C provides that an insurer's denial of benefits may, at the claimant's option, be reviewed in an administrative hearing, an arbitration proceeding, or a civil trial. *See supra* note 4.

Under the foregoing statutes, Plaintiff had a right to bring a civil action against Allstate for its coverage denial and the court was required to determine (1) whether Plaintiff's injuries were "caused by" the accident, and (2) if so, whether Dr. Portner's treatment of Plaintiff resulted in "appropriate and reasonable expenses necessarily incurred." HRS § 431:10C–103(1), (10)(A)(i) and (ii).

### A.

We believe that the court adopted Allstate's third defense theory, that is, that it should apply a recovery standard to Dr. Portner's treatment in consonance with the *Yucoco* order. The court focused on Plaintiff's testimony that the treatment supplied only "temporary relief" and "questioned" Dr. Portner's treatment plan because his services "only provided temporary relief." The court inferred that this "[did] not show a pattern of improvement[.]"

According to Allstate, the third defense theory was applicable if the court found that "Plaintiff's condition was attributable to the subject accident." Consistent with this approach, the court made no express finding that Plaintiff's injuries were not caused by a motor vehicle accident.[16] Thus, we surmise the court found Plaintiff had suffered injuries caused by the accident, but that Dr. Portner's treatment approach had not satisfied the *Yucoco* order standard. We conclude, however, that in rejecting Plaintiff's claim, the court mistakenly relied on a distinction between curative and palliative treatment not drawn under the no-fault law.

### B.

■ The source of a dichotomous approach to curative/palliative treatment for no-fault purposes appears to have been the *Yucoco* order. At trial, Allstate asserted the *Yucoco* order "held that allowing treatment

---

**16.** In its ruling, the court said that Plaintiff "testified that he was not [a] hundred per cent prior to the accident and that may have been due to his prior disabilities[.]" We observe that nothing in the no-fault law indicates that evidence of prior disabilities mandates the rejection of a claimant's no-fault claim in its entirety and any implication to the contrary would be incorrect. *Cf. Lorenzo v. State Farm Fire and Cas. Co.,* 69

Haw. 104, 111, 736 P.2d 51, 55 (1987) (Based on plaintiff's "no-fault automobile policy, the no-fault work loss statutes and its legislative history, plus public policy considerations ... no-fault work loss benefits may not be withdrawn ... where [the plaintiff] suffered a subsequent heart attack unrelated to the car accident, which independently rendered him unable to work.")

that is merely for comfort and pain management is no longer legally valid in light of the 1993 amendments made to the Hawai'i no-fault law."

In that order, the circuit court cited HRS § 431:10C–308.6, which established peer review of provider fees and treatment that exceeded specified schedules.[17] That statute stated, in part, that "[t]he fee schedules or treatment guidelines may be exceeded if a provider of treatment or rehabilitative services finds that the nature of the injuries and the *process of recovery require* a treatment plan resulting in fee schedules or treatment guidelines to be exceeded." (Emphasis added.)

Concluding that "[t]he phrase 'process of recovery require' [was] plain and unambiguous[,]" the circuit court reasoned that "a person's entitlement to no-fault benefits in a situation where the proposed treatment exceeds the fee schedule and treatment frequency guidelines should be determined by whether or not the treatment contributes to the recovery process mandated by statute[.]" The circuit court thus held that "[a]pplication of a comfort and pain management standard is inconsistent with the existing statutes[.]" As indicated *supra*, the *Yucoco* order was

subsequently reversed by memorandum opinion of the supreme court.

HRS § 431:10C–308.6 was in effect at the time of this case but was not directly involved since Allstate did not initiate peer review of the charges involved. However, we believe that the circuit court construed the phrase "process of recovery" too narrowly and the court thus erred in relying on the *Yucoco* order. In our view, it is evident that a recovery *process* broadly implicates all necessary treatment, including management of pain and suffering and the use of diagnostic procedures such as the MRI. HRS § 431:10C–308.6 was repealed effective January 1, 1998. 1997 Haw. Sess. L. Act 251, § 59, at 551. We see no basis in the existing no-fault statutes before or after the repeal of HRS § 431:10C–308.6 for distinguishing curative from palliative treatment for the purpose of describing no-fault benefits.

In this case, the governing statute was HRS § 431:10C–103(10)(A)(i) and (ii), which defined "[n]o-fault benefits" as *"[a]ll appropriate and reasonable expenses necessarily incurred* for medical, hospital, surgical, professional, nursing, dental, optometric, ambulance, prosthetic services, products and accommodations furnished, ... x-ray, ... psychiatric, physical, and occupational therapy and rehabilitation[.]"[18] (Emphasis

---

17. The peer review process subjected a provider's treatment plan to review by a "peer review organization" (PRO) consisting of members of the provider's profession. HRS § 431:10C–308.6(b). The PRO examined the provider's treatment plan "for the purpose of determining [whether] medical and rehabilitative services are appropriate and reasonable." *Id.*

18. HRS § 431:10C–103(10) was subsequently amended in 1997 and 1998. As a result of the 1997 amendments, effective on January 1, 1998, the word "no-fault" was replaced with the words "personal injury protection." 1997 Haw. Sess. L. Act 251, § 2, at 514, § 13 at 523. The definition of "personal injury protection benefits" was moved to a new section under HRS § 431:10C–103.5 (Supp.1998) incorporating both the definition of personal injury benefits and limits on those benefits. *Id.* In addition, the phrase "which are substantially comparable to the requirements of prepaid health care plans" was added to the definition. *Id.* The 1998 amendments added "therapeutic massage" to the list of covered services, and required that both physical therapy and therapeutic massage be authorized "pursuant to prescription by a medical doctor."

1998 Haw. Sess. L. Act 275, § 5, at 924. HRS § 431:10C–103.5 currently provides, in part, as follows:

> **Personal injury protection benefits; defined; limits.** (a) Personal injury protection benefits, with respect to any accidental harm, means all appropriate and reasonable treatment and expenses necessarily incurred as a result of the accidental harm *and which are substantially comparable to the requirements for prepaid health care plans*, including medical, hospital, surgical, professional, nursing, dental, optometric, chiropractic, ambulance, prosthetic services, products and accommodations furnished, x-ray, psychiatric, physical therapy *pursuant to prescription by a medical doctor*, occupational therapy, rehabilitation, *and therapeutic massage by a licensed massage therapist when prescribed by a medical doctor.*
>
> ....
>
> (c) Personal injury protection benefits shall be subject to an aggregate limit of $10,000 per person for services provided under this section. An insurer may offer additional coverage in excess of the $10,000 aggregate limit for services provided under this section, or as provided by rule of the commissioner.

**222**

added.) The supreme court has held that "the law provides ... a no-fault claimant is entitled to 'appropriate and reasonable expenses necessarily incurred[.]'" *Richard v. Metcalf,* 82 Hawai'i 249, 255, 921 P.2d 169, 175 (1996) (quoting HRS § 431:10C–103(10)(A) (Supp.1989)). The statutory standard to have been applied by the court, then, was whether the expenses were "appropriate and reasonable" and "necessarily incurred." We do not discern any language in HRS chapter 431:10C indicating the legislature intended no-fault benefits to be restricted on the basis of whether the services provided were "curative" or "palliative." Indeed, services expressly covered under the no-fault benefits umbrella, such as ambulance and x-ray services, would not directly result in "curing" a patient. In light of the plain language in HRS § 431:10C–103(10)(A), a curative/palliative distinction is only generative of confusion.

▮ In ruling, the court noted that Dr. Portner said "he [did] not know whether [Plaintiff's improvement was] due to treatment or the passage of time[.]" We believe that the court's singular emphasis on this statement was misplaced. As explained above, the standard to be applied was whether the expenses were appropriate, reasonable, and necessarily incurred. Dr. Portner had testified to that effect.

### V.

Finding that the court erred, we vacate its oral order and the judgment. We remand the case on the grounds set forth below, but first discuss the court's rejection of post-denial evidence.

Obviously, on remand, evidence regarding the purpose and reasons for Dr. Portner's recommended MRI and nerve root injection treatment would be relevant to whether Plaintiff's claim was properly denied. We conclude, further, that the court must consider the post-denial evidence in this case.

(Emphases added.) The above noted changes became effective after the accident in the instant case.

▮ In applying the recovery standard, the court subscribed to Allstate's position that the post-denial condition and treatment of Plaintiff was irrelevant. In its trial memorandum, Allstate took the position that its October 13, 1997 denial of "any benefits" was a denial of "future no-fault benefits," and therefore its November 12, 1997 letter denying Dr. Portner's two treatment plans was "arguable [sic] unnecessary." In rejecting the two treatment plans, the November 12 letter had referred to Plaintiff's *"current* complaints." (Emphasis added.) However, to the extent that the November 12 letter was considered by the court, Allstate urged that only evidence retrospective of November 12 was "relevant."

The court did not expressly state whether it found Allstate's denial affected all future no-fault benefits or was effective only with respect to the proposed treatment plans rejected in the November 12 letter. But whatever the case may be, as Allstate admitted at trial, a denial of future benefits may "arguably [be made] too early." Such a concession seems hardly disputable. We agree and conclude, then, that evidence of Plaintiff's post-denial treatment and condition was relevant because it would have a tendency to make the claimed prematurity of the denial more probable or less probable than it would be without such evidence. *See* HRE Rule 401 (1993).

### VI.

▮ As previously noted, Plaintiff was entitled to sue Allstate for denial of treatment ostensibly covered under the definition of no-fault benefits. However, after the action was filed, Plaintiff underwent the MRI and the nerve root injection, and apparently at some point, paid Dr. Portner for those treatments. In *Wilson,* the Hawai'i Supreme Court held that the insured's provider and not the insured is the real party in interest in an action against the no-fault insurer for payment of a provider's unpaid bill.[19]

19. In *Wilson v. AIG Hawaii Ins. Co.,* 89 Hawai'i 45, 46, 968 P.2d 647, 648 (1998), Charlene Wilson (Wilson), the insured, brought suit against AIG, her no-fault insurer, alleging breach of the statutory duty to pay no-fault benefits for surgery

## A.

The supreme court examined HRS § 431:10C–304(1)(A) and (B) [20] in *Wilson*, and determined that "[a] plain reading of [those provisions] reveals that an insurer is only obligated to make direct payment to the insured for wage loss, expenses incurred as a result of accidental harm, funeral services, and attorney's fees and costs." *Wilson*, 89 Hawai'i at 49, 968 P.2d at 651. Thus, the supreme court concluded that "[t]he statute does not confer upon the insured the right to receive payment of medical benefits on behalf of his or her provider." *Id.* Instead, "the statute designates billing/payment of medical expenses to flow directly from the insurer to the provider." *Id.* (citing HRS § 431:10C–304(1)(B)). As a result, the supreme court explained "that the provider, not the insured, is entitled to pursue payment from the insurer for the cost of unreimbursed medical services to the insured." *Id.* at 50, 968 P.2d at 652. The supreme court held, then, "as a matter of law, the insured plays no role in the billing/payment process for medical services. Any dispute relating to the payment of medical services is strictly between the insurer and the provider." *Id.* at 49, 968 P.2d at 651.

## B.

■ Accordingly, the fact that Plaintiff paid Dr. Portner did not confer real party in

---

performed by her physician, Dr. Robinson. Dr. Robinson had "submitted a treatment plan to AIG, ... requesting approval for [a surgical procedure]." *Id.* at 45, 968 P.2d at 647. After the surgery was performed, Dr. Robinson sent AIG a bill for $20,000. *Id.*

AIG submitted the matter to a PRO. *See supra* note 17. The PRO report concluded that Dr. Robinson's "treatment and services were neither appropriate nor reasonable" and recommended payment be denied. *Id.* at 46, 968 P.2d at 648.

Wilson filed suit in the first circuit court, "claiming, *inter alia,* that AIG breached its statutory duty to pay no-fault benefits." *Id.* AIG moved for summary judgment, asserting that Wilson (1) lacked standing, and/or (2) the controversy was moot because Wilson bore no liability for payment of Dr. Robinson's services. *Id.* The circuit court granted AIG's motion. *Id.*

This court vacated the circuit court's order granting AIG's motion, concluding, *inter alia,* that Wilson was a real party in interest. *Id.* The supreme court reversed.

In *Wilson*, the supreme court did not limit its discussion to the PRO process, but analyzed, in relevant part, HRS §§ 431:10C–103(10)(A), –304(1)(A) and (B), and –308.5(e).

20. HRS §§ 431:10C–304(1)(A) and (B) provided, in relevant part, as follows:

> **Obligation to pay no-fault benefits....** Every no-fault insurer shall provide no-fault benefits for accidental harm as follows:
> (1) Except as otherwise provided in section 431:10C–305(d):
> (A) In the case of injury arising out of a motor vehicle accident, *the insurer shall pay, without regard to fault,* to the following persons who sustain accidental harm as a result of the operation, maintenance, or use of the vehicle, an amount equal to the no-fault benefits payable for *wage loss and other expenses* to that person under section 431:10C–103(10)(A)(iii) and (iv) as a result of the injury:

(i) *Any person,* including the owner, operator, occupant, or user of the insured motor vehicle;
....
(B) In the case of injury arising out of a motor vehicle accident, the *insurer shall pay, without regard to fault, to a provider of services on behalf of the persons listed in subparagraph (A), charges for services* covered under section 431:10C–103(10)(A)(i) and (ii)[.]

(Emphases added.)

HRS § 431:10C–304(1) was amended effective January 1, 1998. 1997 Haw. Sess. L. Act 251, § 41, at 538. That section was again amended effective July 20, 1998. 1998 Haw. Sess. L. Act 275, § 21, at 932. As a result of 1997 amendments to HRS § 431:10C–304(1)(A) and (B), the word "no-fault" was replaced by the words "personal injury protection." 1997 Haw. Sess. L. Act 251, § 41, at 538. In addition, HRS § 431:10C–304(1)(A) and (B) were combined into a single subsection (1)(A). *Id.* The reference in the statute to HRS § 431:10C–103(10)(A)(i) and (ii) was changed to HRS § 431:10C–103.5(a). *See supra* note 18. Currently, HRS § 431:10C–304(1)(A) (Supp.1998) provides, in part, as follows:

> [I]n the case of injury arising out of a motor vehicle accident, the insurer shall pay, without regard to fault, to the *provider of services on behalf of the* following persons who sustain accidental harm as a result of the operation, maintenance, or use of the vehicle, an amount equal to the *personal injury benefits* as *defined in section 431:10C–103.5(a)* payable for expenses to that person as a result of the injury:
> (A) Any person, including the owner, operator, occupant, or user of the insured motor vehicle[.]

(Emphases added.) The above noted changes became effective after the accident in the instant case.

interest status on Plaintiff with respect to the doctor's previously unpaid bill. Under the *Wilson* rationale, Dr. Portner was the "party" with an interest in payment for the services under the treatment plans; only Dr. Portner, not Plaintiff, was "entitled to pursue payment from the insurer for the cost of unreimbursed medical services to the insured." *Id.* at 50, 968 P.2d at 652.

■ The supreme court further pointed out that HRS § 431:10C–308.5(e)[21] specifically prohibits a provider, such as Dr. Portner, from directly billing or collecting from the insured for services rendered:

> The provider of services described in [s]ection 431:10C–103(10)(A)(i) and (ii) *shall not bill the insured directly for those services but shall bill the insurer for a determination of the amount payable.* The provider shall not bill or otherwise attempt to collect from the insured the difference between the provider's full charge and the amount paid by the insurer.

*Id.* at 49, 968 P.2d at 651 (quoting HRS § 431:10C–308.5(e)) (emphasis added). The fact that Dr. Portner was paid, in apparent contravention of HRS § 431:10C–308.5(e),[22] does not alter the statutory mandate that "billing/payment of medical expenses ... [must] flow directly from ... [Allstate] to ... [Dr. Portner]." *Id.* The supreme court has recently confirmed that under the no-

fault law, "the insured has a right to receive treatment of injuries, [while] the provider has a right to receive payment for treatment rendered." *Government Employees Ins. Co. v. Hyman,* 90 Hawai'i 1, 7, 975 P.2d 211, 217 (1999) (citations omitted). Any payments made by Plaintiff to Dr. Portner must, as a logical consequence, be returned to Plaintiff. Because Dr. Portner was the real party in interest with respect to the subject charges, we instruct that if he seeks reimbursement from Allstate, he shall be joined or substituted as a party plaintiff to this action, as the case may be, pursuant to District Court Rules of Civil Procedure Rule 17(a).[23]

## VII.

Plaintiff may also be a real party in interest. As previously stated, Plaintiff received treatment after his complaint was filed and apparently paid for the treatments himself. Plaintiff's status at the time of suit and of payment was thus factually distinguishable from the insured in *Wilson,* where the "admitted purpose in filing her lawsuit was to recover no-fault benefits against AIG [ (Wilson's insurer) ] on behalf of Dr. Robinson [ (Wilson's provider) ]." 89 Hawai'i at 50, 968 P.2d at 652.

When an insurer denies no-fault benefits "on the basis that they are unreasonable and

---

**21.** HRS § 431:10C–308.5(e) was amended effective January 1, 1998. 1997 Haw. Sess. L. Act 251, § 45, at 543. As a result of 1997 amendments to HRS § 431:10C–308.5(e), the reference to HRS § 431:10C–103(10)(A)(i) and (ii) was replaced by HRS § 431:10C–103.5(a) to reflect renumbering of the provisions defining "personal injury protection" benefits. 1997 Haw. Sess. L. Act 251, § 45, at 543.

The current version of HRS § 308.5 (Supp. 1998) is substantially similar to the version discussed in the text:

> The provider of services described in section 431:10C–103.5(a) shall not bill the insured directly for those services but shall bill the insurer for a determination of the amount payable. The provider shall not bill or otherwise attempt to collect from the insured the difference between the provider's full charge and the amount paid by the insurer.

**22.** We note there is no evidence in the record that Plaintiff or Dr. Portner intentionally or knowingly violated HRS § 431:10C–308.5(e).

**23.** District Court Rules of Civil Procedure Rule 17(a) provides as follows:

> (a) Real Party in Interest. Every action shall be prosecuted in the name of the real party in interest; except that (1) an executor, administrator, personal representative, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in such party's own name without joining such party the party [sic] for whose benefit the action is brought, and (2) this requirement shall not be mandatory where a subrogee is a real party in interest. *No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.* (Emphasis added.)

unnecessary, the value of [the] medical expenses denied cannot be included as an 'amount paid or accrued' for purposes of establishing the tort threshold." *Id.* (citing *Ho v. Leftwich,* 88 Hawai'i 251, 259, 965 P.2d 793, 801 (1998)). The supreme court thus acknowledged that "an insured may be a real party in interest with respect to protecting his or her ability to sue in tort, which, in turn, is dependent upon the insured reaching the tort threshold." *Id.* (internal quotation marks omitted). Wilson's failure to articulate such a claim deprived "her [of] the status of a real party in interest." *Id.* at 51, 968 P.2d at 653.

 However, in light of the circumstances of this case, the issuance of *Wilson* during this appeal's pendency, and judicial economy, we believe it appropriate that on remand, Plaintiff be allowed, if he wishes, to amend his pleadings to assert that the denial jeopardized his right to assert tort liability. Such an amendment would secure him real party in interest status.[24]

## VIII.

 We recognize that in many no-fault cases, treatment may be of a continuing nature and that disputes as to the necessity and reasonableness of expenses may periodically arise. That the no-fault law permits challenges at every stage of suggested treatment creates great potential for delay. Thus, independent of formal proceedings, we assume that relevant post-denial information regarding an insured's condition or treatment, such as in Plaintiff's case, may be submitted to the insured's insurer, such as Allstate, for its consideration. In Allstate's words, "an insurer [may] den[y] benefits at a time which is arguably too early." Submittal of post-denial information is not only prudent and practical, but in keeping with the law's resolve to promote the timely determination of benefits. We believe review of such information is required by that "legal duty, implied in a first[-party] ... insurance contract[ ][25] that the insurer must act in good faith in dealing with its insured, and a breach of that duty of good faith gives rise to an independent tort cause of action." *Best Place, Inc. v. Penn America Ins. Co.,* 82 Hawai'i 120, 132, 920 P.2d 334, 346 (1996).

## IX.

Thus, we vacate the March 5, 1998 oral order and the May 1, 1998 judgment, and remand to the court for disposition as instructed herein.

---

24. According to his account with Dr. Portner and Portner Orthopedic Rehabilitation, Plaintiff had accrued charges in the amount of $3,684.09. Also, according to a document entitled "Medical Bill—Loss History," as of February 19, 1998, Allstate had paid a total of $5,327.05 for Plaintiff's medical bills. A portion of those payments were made to Dr. Portner and Portner Orthopedic Rehabilitation; however, it is not clear from the record what part, if any, of the $3,684.09 accrued by Plaintiff was actually paid by Allstate.

HRS § 431:10C–308(c), entitled "Medical-rehabilitative limit," provided that the tort threshold at the time relevant to this case was $10,000.

25. "[A] 'first-party claim' refers to an insurance agreement where the insurer agrees to pay claims submitted to it by the insured for losses suffered by the insured." *Best Place, Inc. v. Penn America Ins. Co.,* 82 Hawai'i 120, 124 n. 4, 920 P.2d 334, 338 n. 4 (1996).